# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

PUBLIC UTILITY DISTRICT NO. 2 OF
PACIFIC COUNTY, a Washington
Corporation,

          Respondent,

v.

COMCAST OF WASHINGTON IV,
INC., a Washington corporation;
CENTURYTEL OF WASHINGTON,
INC., a Washington corporation; and
FALCON COMMUNITY VENTURES I,
L.P., a California limited partnership,
d/b/a CHARTER COMMUNICATIONS,

          Appellants.

DIVISION ONE

No. 70625-0-I

PUBLISHED OPINION

FILED: October 13, 2014

DWYER, J. — Pacific County Public Utility District No. 2 (hereinafter District) permitted Comcast of Washington IV, Inc., CenturyLink of Washington, Inc.,[1] and Falcon Community Ventures I, L.P., d/b/a Charter Communications (collectively Companies) to attach their communications equipment to its utility poles pursuant to agreements with the Companies. However, at the beginning of 2007 the District revised its rates and instituted new nonrate terms and conditions, which resulted in significant cost increases to the Companies. After the Companies refused to pay the District at the new rates, declined to sign the proposed agreement, and refused to remove their equipment from its poles, the District initiated this lawsuit.

---

[1] Previously d/b/a CenturyTel of Washington, Inc.

In early 2008, the legislature amended the statute governing utility pole attachment rates, RCW 54.04.045, effective June 12, 2008. Prior to the amendment, rates calculated by Washington public utility districts (PUDs) needed only to be "just, reasonable, nondiscriminatory and sufficient." Former RCW 54.04.045(2) (1996).[2] The amendment, however, included a specific formula, the result of which would yield a "just and reasonable" rate. RCW 54.04.045(3)(a)-(c). Whether the District's revised rate complied with the amended statute became the central dispute in this case.

In the trial court—and now on appeal—the District and the Companies maintained that each provision of the two-part formula written by the legislature reflected a certain preexisting formula. However, they disputed which were the apposite formulas. On appeal, we are presented with three principal issues: (1) whether the nonrate terms and conditions in the proposed agreement complied with RCW 54.04.045(2); (2) whether the trial court erred by concluding that the District's revised rates prior to June 12, 2008 complied with RCW 54.04.045(2); and (3) whether the trial court erred by concluding that the 2008 statutory amendment, codified at RCW 54.04.045(3)(a)-(c), reflects the preexisting formulas as proposed by the District's expert witness. We affirm the trial court with respect to the first two issues, subject only to the severance of a few nonrate terms. However, with respect to the third issue, we reverse and remand to the trial court for further proceedings consistent with this opinion.

---

[2] "All rates, terms, and conditions made, demanded or received by a locally regulated utility for attachments to its poles must be just, reasonable, nondiscriminatory and sufficient."

I

The District, which is organized as a municipal corporation pursuant to RCW 54.04.020, is a consumer-owned utility providing services in Pacific County, Washington.[3] The District owns and maintains poles that allow it to furnish electricity to customers in Pacific County. In all, it serves approximately 17,000 customers in predominantly rural areas.

The Companies provide various communication services to customers in Washington, including in Pacific County. In order to provide these services, the Companies attach communications equipment to the District's utility poles. The Companies were initially licensed to attach their equipment to the District's poles under rental agreements assigned to them by previous communications providers in Pacific County. These assigned agreements dated back to the 1970s and 1980s with respect to Comcast and Charter, and to the 1950s and 1960s with respect to CenturyLink.

Prior to 2007, the District's annual pole attachment rates of $8.00 per pole for telephone companies and $5.75 per pole for cable companies had remained fixed for 20 years. In February of 2006, the District provided written notice to the Companies that it intended to terminate the agreements. The District advised the Companies that it would implement new pole attachment rates effective January 1, 2007, and that the District would provide copies of a new pole attachment agreement for the Companies to review.

---

[3] There are 28 PUDs operating in Washington. Washington Public Utility Districts Association, Frequently Asked questions, http://www.wpuda.org/pud-faqs.cfm (last visited August 28, 2014).

Several years earlier, the District had retained EES Consulting, Inc. to perform a rate study. After analyzing the District's rates, EES recommended that the District increase its rate to no less than $20.65 but closer to $36.39 per pole. In making this recommendation, EES considered four different methodologies or formulas: the Federal Communications Commission (FCC) Cable formula,[4] the FCC Telecom formula,[5] the American Public Power Association (APPA) formula,[6] and the Washington PUD Association formula.[7] Gary Saleba, the president and chief executive officer of EES, described the method by which EES arrived at its recommendation.

> The study that we performed in 2004/2005 is summarized in Exhibit 6, and what we did in Exhibit – in the study, which was

---

[4] The Cable formula states that

a rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

47 U.S.C. § 224(d).

[5] The Telecom formula is calculated as follows:

(2) A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

(3) A utility shall apportion the cost of providing usable space among all entities according to the percentage of usable space required for each entity.

47 U.S.C. § 224(e).

[6] The parties provided an algebraic representation of the APPA formula, which is as follows:

**Maximum Rate** = Assignable Space Factor + Common Space Factor
**Assignable Space Factor** = Space Occupied by Attachment (Assignable Space) x Assignable Space (Pole Height) x Average Cost (of Bare Pole) x Carrying Charge
**Common Space Factor** = Common Space (Pole Height) x Average Cost of Bare Pole (Number of Attachers) x Carrying Charge

[7] The parties also provided an algebraic representation of the Washington PUD Association method, which is as follows:

Annual rental rate = Accumulated average Pole Value (PV) × Annual Cost Ratio (ACR) × Pole Use Ratio (PR)

dated April of 2005, was to take a look at what the expenses were for the PUD or the revenue requirement for a test period of 2004, and then went through – after determining what the revenue requirement for the '04 period was, we went through the four different methodologies I talked about earlier and calculated rates, pole attachment rates for the PUD, for the FCC cable, FCC telecom, APPA method, and the PUD Association method.

While the study performed by EES utilized all four methodologies, in proposing the range between $20.65 and $36.39, EES relied on the FCC Telecom formula and the APPA formula, respectively.

Once the District received the results of the study and the recommendation from EES, the District's general manager and finance manager, Douglas Miller and Mark Hatfield—after considering and discussing the results with the District's supervisors—concluded that an annual rate of $19.70 per pole was appropriate. However, in light of the significant rate increase, Miller recommended to the District's board of commissioners a transition rate of $13.25 per pole for 2007, with the $19.70 per pole rate to commence on January 1, 2008. Miller described the deliberative process of the District in his testimony.

> Two times a month we have management staff meetings, and we talk about things that are happening, things we're working on. It's the – it's the supervisors at the PUD that work directly for me. And we meet and talk about issues. And we talked about the agreement and the rates and – or the study and the rates that were recommended. And out of that, we kicked around where we thought the numbers should be. And that's where we got the 13.25 and the 19.70.
> We – at that time we were first starting to install fiber, our own fiber plant, which would change the number of contacts per pole, average number of contacts per pole, which would adjust the – those formulas. And we made our best guess of where that might go during the five-year period of what we were going to recommend these rates to be to the board.
> And based on those assumptions, we came up with the

19.70. And then as we were debating the 19.70, we thought, you know, this is a pretty big jump from 5.75 or $8, you know, to get to the 19.70, so let's do a one-year interim rate that kind of steps to the 19.70. And if you take the 5.75 and you add that to the $8 and divide by two, it's a midpoint between those two rates. And you add that to 19.70 and then divide by two and round it off, it comes to 13.25. So that's how we got the 13.25.

Miller made his rate recommendation to the board of commissioners at hearings held on December 5, 2006 and December 19, 2006, as well as at the commissioners' meeting held on January 2, 2007. Although the Companies were aware that the meetings were open to the public, no representatives of the Companies attended the public hearings or the public meeting. Furthermore, the Companies never requested agendas or minutes, which would have been available upon request.

On January 2, 2007, the board of commissioners adopted Resolution No. 1256, which revised the District's annual pole attachment rate to $13.25 per pole, effective January 1, 2007 and $19.70 per pole, effective January 1, 2008.

In addition to revising its rate, the District developed a new form of agreement for attaching entities, which included nonrate terms and conditions. The District began with a template agreement developed by the APPA and made revisions in an effort to make it more applicable to the District. District management, including operations, engineering, and financial personnel, were consulted in developing the new agreement.

The District also communicated with the Companies regarding the proposed agreement. The District sent a version of the proposed agreement to the Companies for review and comment in early 2006. Over the next six months,

the District received feedback from the Companies. It then incorporated some of the Companies' suggestions and rejected others before mailing out for signature the proposed agreement in November 2006. This version of the proposed agreement generated additional feedback, which led the District to further modify the agreement before sending a revised version to the Companies in August 2007. The transmittal letter attached to the revised version requested that the Companies return the signed agreement by October 31, 2007. The letter stated that, in the event that the Companies did not wish to remain on the District's poles under the terms of the new agreement, the Companies were to notify the District of their plans for removing their equipment. In early October, the District contacted the Companies to remind them of the impending October 31, 2007 deadline. However, the Companies refused to sign the agreement, declined to remove their equipment, and tendered payment only at the historic rates; the District did not accept the Companies' tender of payment.[8]

Two other licensees attached their equipment to the District's poles. One executed the first draft of the new agreement and both timely began paying at the revised rate.

While the existing agreements between the District and the Companies permitted the District to remove the Companies' equipment from its poles if the

---

[8] The record indicates that Comcast and Charter tendered payment at the historic rates. Additionally, Charter's tender requested that the District accept the amount offered, "pending the outcome of the litigation." CenturyLink, on the other hand, tendered payment "in an effort to completely fulfill" its rental obligation. Although Comcast and Charter, in their joint briefing, cite to Exhibit 515 in what we perceive to be an attempt to direct our attention to a tender of payment made by Comcast, we find no evidence of the existence of an exhibit bearing that number, whether in the trial court record, the verbatim report of proceedings, or elsewhere in the materials designated by the parties.

Companies failed to do so, the District did not exercise its right. Instead, on December 28, 2007, the District filed complaints against all three of the Companies, alleging claims of breach of contract, trespass, and unjust enrichment, and requesting relief in the form of a declaratory judgment, injunctive relief, and damages. The Companies counterclaimed and sought to enjoin the District from imposing terms in violation of RCW 54.04.045. The lawsuits were then consolidated by agreement.

In March 2008, the legislature amended RCW 54.04.045, with an effective date of June 12, 2008. ENGROSSED SECOND SUBSTITUTE H.B. 2533, 60th Leg., Reg. Sess. (Wash. 2008). Prior to the amendment, pole attachment rates charged by Washington PUDs were required only to be "just, reasonable, nondiscriminatory and sufficient." Former RCW 54.04.045(2). In amending the statute, however, the legislature instituted a specific formula, the result of which would constitute a "just and reasonable rate." RCW 54.04.045(3).

> (3) A just and reasonable rate must be calculated as follows:
> (a) One component of the rate shall consist of the additional costs of procuring and maintaining pole attachments, but may not exceed the actual capital and operating expenses of the locally regulated utility attributable to that portion of the pole, duct, or conduit used for the pole attachment, including a share of the required support and clearance space, in proportion to the space used for the pole attachment, as compared to all other uses made of the subject facilities and uses that remain available to the owner or owners of the subject facilities;
> (b) The other component of the rate shall consist of the additional costs of procuring and maintaining pole attachments, but may not exceed the actual capital and operating expenses of the locally regulated utility attributable to the share, expressed in feet, of the required support and clearance space, divided equally among the locally regulated utility and all attaching licensees, in

- 8 -

addition to the space used for the pole attachment, which sum is divided by the height of the pole; and

(c) The just and reasonable rate shall be computed by adding one-half of the rate component resulting from (a) of this subsection to one-half of the rate component resulting from (b) of this subsection.

RCW 54.04.045(3)(a)-(c). With respect to subsection (3)(a), the legislature included the following provision:

For the purpose of establishing a rate under subsection (3)(a) of this section, the locally regulated utility may establish a rate according to the calculation set forth in subsection (3)(a) of this section or it may establish a rate according to the cable formula set forth by the federal communications commission by rule as it existed on June 12, 2008, or such subsequent date as may be provided by the federal communications commission by rule, consistent with the purposes of this section.

RCW 54.04.045(4).

Included with the amendment was a statement of legislative intent, which is as follows:

It is the policy of the state to encourage the joint use of utility poles, to promote competition for the provision of telecommunications and information services, and to recognize the value of the infrastructure of locally regulated utilities. To achieve these objectives, the legislature intends to establish a consistent cost-based formula for calculating pole attachment rates, which will ensure greater predictability and consistency in pole attachment rates statewide, as well as ensure that locally regulated utility customers do not subsidize licensees. The legislature further intends to continue working through issues related to pole attachments with interested parties in an open and collaborative process in order to minimize the potential for disputes going forward.

ENGROSSED SECOND SUBSTITUTE H.B. 2533. Whether the revised rate instituted by the District in Resolution No. 1256[9] was in compliance with the amended statute became the central dispute in this case.

After extensive discovery was conducted, the Companies filed a joint motion for partial summary judgment in December 2009, in which they requested that the trial court determine as a matter of law that RCW 54.04.045(3)(a) reflects the FCC Cable formula and that RCW 54.04.045(3)(b) reflects the FCC Telecom formula. The trial court denied the Companies' joint motion.[10]

Thereafter, in October 2010, this case was tried before the Honorable Michael J. Sullivan. Ample testimony was presented by the parties, including testimony from three expert witnesses, two of whom—Gary Saleba on behalf of the District and Patricia Kravtin on behalf of Comcast and Charter—opined that subsections (3)(a) and (3)(b) reflected preexisting formulas; however, Saleba and Kravtin disagreed as to which formulas were reflected by each subsection.[11]

On March 15, 2011, the trial court issued a memorandum decision in which it ruled in favor of the District and against the Companies. In its decision, the trial court stated that it would entertain proposed findings of fact and conclusions of law. Thereafter, the District submitted proposed findings of fact and conclusions of law, as well as a proposed judgment, to which the Companies filed extensive objections and proposed revisions. The District also submitted a

---

[9] Specifically, the annual rate of $19.70 per pole, which was the rate in effect at the time that the amended statute became effective.
[10] This remained the Companies' position at trial and on appeal.
[11] The focus of Mark Simonson's testimony—the third expert witness (called by CenturyLink)—was on nonrate terms and conditions.

- 10 -

motion, proposed findings of fact and conclusions of law, and a proposed order, all of which related to its request for attorney fees and costs; the Companies objected and provided responses. The trial court heard oral argument on the proposed findings of fact and conclusions of law on September 16, 2011. On December 12, the trial court entered the findings of fact, conclusions of law, order, and judgment proposed by the District—both as to the substantive issues and as to the request for attorney fees and expenses. The trial court also awarded damages, as well as fees and costs, in favor of the District, totaling $1,856,155.02.

Of particular significance to the marrow of this appeal, the trial court concluded that "Section 3(a) of RCW 54.04.045 (2008) reflects the FCC Telecom method and Section 3(b) reflects the APPA method as of the date of trial." Conclusions of Law 10. Additionally, the trial court concluded that the District "did not act arbitrarily or capriciously, in interpreting Section 3(a) of RCW 54.04.045 as the FCC Telecom formula and Section 3(b) as the APPA formula for PUD pole attachment rates as of the date of trial." Conclusions of Law 11. The trial court further concluded that the District's revised rates "were just, reasonable, non-discriminatory, and sufficient, those rates being $13.25 prior to January 1, 2008, and $19.70 after January 1, 2008." Conclusions of Law 12.

In rejecting the Companies' interpretation of subsections (3)(a) and (3)(b) of RCW 54.04.045, the trial court found, among other things, that the rate derived by one of the Companies' expert witnesses—Patricia Kravtin—was "unreasonable and impractical as it relates to this case." Findings of Fact 34. In

- 11 -

addition, the trial court found that "[t]he opinions of Defendants' rate expert, Patricia Kravtin, were based primarily on theoretical analysis of economics and public policy, rather than actual local information regarding Pacific County and Pacific PUD. She had never visited Pacific County prior to trial." Findings of Fact 35. Moreover, the trial court found that "Defendants' rate expert Patricia Kravtin's opinion on the PUD's maximum legal rate was lower than what Defendants had been voluntarily paying for over twenty years." Findings of Fact 36.

After the Companies filed an untimely notice of appeal, Division Two entered an order permitting the Companies to appeal. On April 23, 2012, the Companies filed a separate appeal of the trial court's award of $27,690.14 for fees and costs the District incurred on the Companies' posttrial motion to vacate the judgment. That appeal was consolidated with the Companies' other appeal.

The District then filed in the Supreme Court a motion for discretionary review of the decision permitting the Companies to appeal. A subsequent motion to stay proceedings in Division Two, pending the Supreme Court's action, was granted on March 27, 2012. On June 5, 2012, the Supreme Court denied the District's motion for discretionary review.[12, 13] The Companies' appeal was then transferred to Division One.

---

[12] Although the parties do not cite to the record in support of this factual assertion, they are in accord that the District's motion for discretionary review was denied. Compare CenturyLink Opening Br. at 13 n.9, with District's Br. at 16-17.

[13] In the District's merits brief, it includes a version of the procedural history that took place between the denial of its motion for discretionary review and the transfer of this appeal to Division One. However, the District fails to cite to the record to support its version of events, which precludes us from confirming the veracity of its factual statements.

II

The Companies contend that the trial court erred in its treatment of the nonrate terms and conditions in the District's proposed pole attachment agreement. Specifically, they aver that the trial court improperly applied a deferential standard of review, which, in turn, led to an erroneous conclusion that the terms and conditions were just, reasonable, nondiscriminatory, and sufficient. We disagree.

A

The Companies assert first that the trial court erred by limiting its review of the imposition of the District's nonrate terms and conditions to determining whether they were arbitrary and capricious. Their assertion is unavailing.

Where "municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply," it is proper to leave "the choice of means used in operating the utility to the discretion of municipal authorities." City of Tacoma v. Taxpayers of City of Tacoma, 108 Wn.2d 679, 695, 743 P.2d 793 (1987). Accordingly, "judicial review of municipal utility choices" is limited "to whether the particular contract or action was arbitrary or capricious, or unreasonable." City of Tacoma, 108 Wn.2d at 695 (citation omitted).

> Arbitrary and capricious refers to "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous."

Lane v. Port of Seattle, 178 Wn. App. 110, 126, 316 P.3d 1070 (2013) (quoting Abbenhaus v. City of Yakima, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978)), review denied 180 Wn.2d 1004 (2014).

Consistent with its holding in City of Tacoma, our Supreme Court has shown deference to an implementing entity where the governing statute delineated general boundaries for proper rates. See People's Org. for Wash. Energy Res. v. Utils. & Transp. Comm'n, 104 Wn.2d 798, 808, 823, 711 P.2d 319 (1985) (where the rates to be set were required to be *"fair, reasonable, and sufficient,"* the Supreme Court concluded that "the WUTC[14] did not exceed its statutory authority and was not arbitrary or capricious").

While RCW 54.04.045(3)(a)-(c) sets forth specific instructions regarding the method of calculating just and reasonable rates, it does not provide similar guidance with respect to nonrate terms and conditions, requiring only that they "be just, reasonable, nondiscriminatory,[15] and sufficient." RCW 54.04.045(2).

Given the similarity between the general boundaries of the statute in People's Org. for Wash. Energy Res. and the general boundaries in RCW 54.04.045(2),[16] we conclude that it was proper for the trial court to limit its review of the District's nonrate terms and conditions to determining whether they were arbitrary and capricious.

---

[14] Washington Utilities and Transportation Commission.

[15] "'Nondiscriminatory' means that pole owners may not arbitrarily differentiate among or between similar classes of licensees approved for attachments." RCW 54.04.045(1)(d).

[16] It is of little significance that People's Org. for Wash. Energy Res. involved rates, whereas nonrate terms and conditions are at issue here. City of Tacoma articulates that "municipal utility actions," which surely include a PUD setting nonrate terms and conditions, are entrusted to the discretion of the municipal authorities. 108 Wn.2d at 695.

B

The Companies next take issue with the procedure by which the District considered and decided on the nonrate terms and conditions. More specifically, the Companies assert that the District's refusal to negotiate the nonrate terms and conditions of the agreement with the Companies was procedurally unconscionable. This assertion is unavailing.

Procedural unconscionability involves "blatant unfairness in the bargaining process and a lack of meaningful choice." Torgerson v. One Lincoln Tower, LLC, 166 Wn.2d 510, 518, 210 P.3d 318 (2009).

> Procedural unconscionability is determined in light of the totality of the circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms, and (3) whether the terms were "hidden in a maze of fine print."

Torgerson, 166 Wn.2d at 518-19 (internal quotation marks omitted) (quoting Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 391, 858 P.2d 245 (1993)).

While the Companies maintain that the District was obligated to negotiate the nonrate terms and conditions, they cite no authority to that effect. Governmental entities such as the District are held to standards of transparency, including the Open Public Meetings Act of 1971,[17] which was complied with by the District herein;[18] however, we are directed to no authority obligating the

---

[17] Ch. 42.30 RCW.
[18] The trial court concluded that "[t]he District met the requirements of the Open Public Meetings Act in its consideration of new pole attachment rates, terms, and conditions." Conclusions of Law 32. CenturyLink concedes that "the District provided the requisite formal

- 15 -

District to negotiate individually regarding nonrate terms and conditions.

The record establishes that proper public proceedings were held, that the Companies were given notice of these proceedings, and that they failed to participate. To the extent that the District did discuss the terms of the proposed agreement with the Companies, it did so for reasons that were not tethered to any legal obligation.

C

The Companies finally take issue with the substance of many of the nonrate terms and conditions, asserting that they violate RCW 54.04.045(2) or, alternatively, that they are substantively unconscionable. From this, the Companies assert that the entire proposed agreement is invalid, arguing that "[s]evering so many unlawful provisions would render the 2007 Agreement unintelligible and unworkable." While several of the District's nonrate terms are untenable, they are severable from the proposed agreement. This is so because they do not materially alter the essence of the agreement, which is the severability standard set forth in the proposed agreement.[19] Ultimately, we decline to hold that these unsupported nonrate terms render the entire proposed agreement unenforceable, whether because of RCW 54.04.045(2) or the common law prohibition of substantively unconscionable terms.

---

public notice of its Commissioners' consideration of the new rates." Neither Comcast nor Charter challenges the trial court's conclusion of law on appeal.

[19] The severability clause in the proposed agreement provides for the following:
If any provision or portion thereof of this Agreement is or becomes invalid under any applicable statute or rule of law, and such invalidity does not materially alter the essence of this Agreement to either party, such provision shall not render unenforceable this entire Agreement but rather it is the intent of the parties that this Agreement be administered as if not containing the invalid provision.

"We review the trial court's decision following a bench trial to determine whether the findings of fact are supported by substantial evidence and whether those findings support the conclusions of law." 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 720, 281 P.3d 693 (2012). "'Substantial evidence' is a quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true." Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 56, 63-64, 277 P.3d 18 (2012). "If that standard is satisfied, we will not substitute our judgment for that of the trial court even though we might have resolved disputed facts differently." Green v. Normandy Park, 137 Wn. App. 665, 689, 151 P.3d 1038 (2007); accord 224 Westlake, LLC, 169 Wn. App. at 720 ("Evidence may be substantial even if there are other reasonable interpretations of the evidence."). Indeed, "[r]eview is deferential, requiring the appellate court to view the evidence and its reasonable inferences in the light most favorable to the prevailing party in the highest forum that exercised fact-finding authority." Johnson v. Dep't of Health, 133 Wn. App. 403, 411, 136 P.3d 760 (2006). On the other hand, "[w]e review questions of law and conclusions of law de novo." Newport Yacht Basin Ass'n, 168 Wn. App. at 64.

"Substantive unconscionability involves those cases where a clause or term in the contract is one-sided or overly harsh." Townsend v. Quadrant Corp., 153 Wn. App. 870, 882, 224 P.3d 818 (2009), aff'd on other grounds by 173 Wn.2d 451, 268 P.3d 917 (2012). Terms used to define substantive unconscionability include "'[s]hocking to the conscience,'" "'monstrously harsh,'"

and "'exceedingly calloused.'" Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d

293, 303, 103 P.3d 753 (2004) (internal quotation marks omitted) (quoting

Nelson v. McGoldrick, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995)).

The trial court made the following findings of fact with regard to the

nonrate terms and conditions:

> 30. There are credible reasons relating to safety, reliability, financial stability, cost, and other district considerations for the terms and conditions of the proposed Agreement Defendants challenged.
> 31. There are credible reasons for provisions in the proposed Agreement Defendants challenge, including but not limited to, those relating to:
> - Tagging of fiber
> - Unauthorized attachment fees
> - Removal of attachments after agreement termination and reimbursement of removal costs if not removed
> - Waivable requirement for a bond
> - Attacher responsibility for hazardous materials they bring onto the District's property
> - Requirement of a permit for overlashing, other than in an emergency
> - Liability and indemnification provisions providing protection to the District
> - Transfer or relocation of attachments
> - Removal of nonfunctional attachments
> - Inspections by the District
> - Annual reports on attachment locations
> - Furnishing copies of required insurance policies on District request
> - Survivability of certain continuing obligations after Agreement termination
> - Attorneys' fees and cost provisions
> - "Grandfathering" with respect to NESC requirements
> - Permitting requirements
> - Waivable professional certification requirement, including the alternative of a "licensee in good standing"
> - Invoicing and payment provisions
> - Requirement that any assignee of the Agreement sign the Agreement
> - Requirement that guy wires be bonded and insulated

- Requirement of District consent to placement of facilities within four feet of the pole base

The trial court then reached the following conclusions of law:

30.    The proposed terms and conditions of the District's new Pole Attachment Agreement were just, reasonable, non-discriminatory, and sufficient, and were not arbitrary or capricious.
. . . .
33.    The District's proposed Pole Attachment Agreement is not unconscionable.
. . . .
35.    The non-rate terms and conditions of the District's proposed Pole Attachment Agreement meet the requirements of RCW 54.04.045, once a few undisputed revisions to the Agreement are made for pole attachment application processing timing and notification provisions in Sections 5 and 6 of the 2008 amendments.
36.    The District's pole attachment rates, terms, and conditions are not illegal or unlawful.

The Companies take issue with a great many of the nonrate terms and conditions. Although we agree that not all terms are valid, we do not hold that their invalidity renders the entire agreement invalid. Instead, they may be severed and the agreement may be preserved.

First, the Companies contend that the proposed agreement is ambiguous as to whether the District's attachment fees are on a per pole or a per attachment basis. Even assuming, without deciding, that this ambiguity existed, evidence was adduced at trial that clarified the District's intent to charge on a per pole basis.[20] This evidence was of a sufficient quantum to persuade a rational, fair-

---

[20] Contrary to the Companies' position, the parol evidence rule does not bar the admission of extrinsic evidence to interpret an ambiguous provision. See Berg v. Hudesman, 115 Wn.2d 657, 666-68, 801 P.2d 222 (1990).

- 19 -

minded person that the District intended to charge on a per pole basis.

Accordingly, the Companies' contention lacks merit.[21]

Second, the Companies contend that the proposed agreement is

ambiguous as to whether "grandfathering" is permitted. The practice of

"grandfathering" excuses an attacher from upgrading its existing attachments to

comply with engineering standards. The Companies assert that although section

4.1 of the proposed agreement permits "grandfathering," section 6.1 seems to

foreclose its use by indicating that all preexisting installations must comply with

the agreement, including service standards, within 18 months. However, Miller,

the District's general manager, explained how these two provisions, in fact, work

in tandem.

> What it says under 6.1 is that for attachments that did not meet the
> standard at the time they were installed or don't meet, you know,
> the standard if they've just installed. Essentially, if they don't meet
> the standard when they were installed, then they need to be
> brought up to, you know, the standard. If they did meet the
> standard at the time they were installed . . . then they're
> grandfathered, then they're okay, because under 4.1 it indicates
> that they're grandfathered, that they're fine.

Miller's testimony provides a sufficient quantum of evidence to persuade a

rational, fair-minded person that "grandfathering" is permitted under certain, if not

all, circumstances. Substantial evidence supports the trial court's findings of fact

as to "grandfathering."

---

[21] In addition, CenturyLink argues that the question of appropriate fees is rendered ambiguous in the agreement. This is so, it asserts, because section 3.1 indicates that the parties are to look to Appendix A to the agreement to determine applicable fees, but that Appendix A refers the parties back to section 3.1. CenturyLink's reading of these two sections is willfully blind. Prominently displayed in Appendix A are the proper fees to be charged. There is no ambiguity.

Third, Comcast and Charter contend that the requirement that they pay any "rearrangement or transfer" costs necessary to accommodate the District's own communications fiber is unreasonable. At trial, the District's general manager agreed that licensees should not be required to pay to make room for the District's communications fiber. On appeal, the District does not dispute Comcast's and Charter's contention, or otherwise direct our attention to evidence in the record supporting the trial court's finding. However, in the absence of evidence that severing this term would materially alter the essence of the agreement, we conclude that this term is severable from the proposed agreement.

Fourth, the Companies contend that section 6.3, which requires attacher employees who are responsible for installing cable attachments to have experience performing installation work on electric transmission or distribution systems, is unreasonable. However, the District's chief of engineering and operations testified that such experience would be necessary if these employees were working in the safety zone, and the record indicates that the Companies' equipment is, at times, in the safety area. We are satisfied that this type of provision, which ensures a safe work environment, is well within the bounds of reason.[22]

Fifth, Comcast and Charter contend that the requirement in section 6.3

---

[22] Both as to this provision and as to section 6.3 of the proposed agreement (which we address in resolving the sixth argument raised by the Companies), Comcast and Charter additionally argue that they are unreasonable because cable companies do not employ electrical workers. We summarily reject this argument.

- 21 -

that postconstruction inspections be performed by licensees is inconsistent with the District's own policies and standard industry practice. The District's chief of engineering testified that it would, in fact, be reasonable for the District to continue performing postconstruction inspections itself. The District does not address Comcast's and Charter's contention in its merits brief. This provision, however, is severable pursuant to the severability clause. This is so because there is no evidence that severing it from the agreement materially alters the essence of the agreement.

Sixth, Comcast and Charter contend that licensees should not, contrary to the requirement of section 6.3, have to use a professional engineer when submitting pole attachment applications. This is so, they aver, because it is not required to by law. Furthermore, Comcast and Charter argue that the District currently only requires a professional engineer for complex and large jobs where there is a concern about weight on the poles. However, Miller testified that, at the urging of the Companies, the District added a provision that would waive the requirement of using a professional engineer for "those that we haven't had issues with and have worked with us." The thrust of Miller's testimony reveals that this term was included not to burden established licensees such as Comcast and Charter but, rather, to protect the District against the prospect of irresponsible future licensees. Adopting this provision was well within the District's discretion.

- 22 -

Seventh, CenturyLink contends that the unilateral attorney fees provision (in the District's favor) contained in the proposed agreement is contrary to law. However, RCW 4.84.330 states, in pertinent part:

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.

Thus, the agreement's unilateral attorney fees provision will not preclude a prevailing party from recovering attorney fees. Contrary to CenturyLink's contention, however, RCW 4.84.330 does not declare unilateral attorney fees provisions to be void or illegal; the statute merely operates to make them bilateral.

Eighth, CenturyLink contends that the District's attempt to force it to bear the cost of "undergrounding" its facilities in section 10.3 of the proposed agreement is unlawful. In support of this contention, it cites to RCW 35.99.060, which permits "cities and towns" to require service providers to relocate facilities under certain circumstances. From this, CenturyLink urges that because the District is not a city or a town, its attempt to have CenturyLink bear the cost of "undergrounding" is contrary to law. We disagree. Nowhere in RCW 35.99.060 does the legislature foreclose a PUD from requiring an attacher to bear the cost of "undergrounding" its facilities.

Nevertheless, CenturyLink argues that this would run contrary to its Washington Utilities and Transportation Commission (WUTC) tariff, which

requires its customers to bear the cost of customer requests for relocation or rearrangement of facilities. However, CenturyLink's argument assumes that the WUTC can enforce its tariff against the District, an assumption that is rebutted by applicable statute. See RCW 54.04.045(7) ("Nothing in this section shall be construed or is intended to confer upon the utilities and transportation commission any authority to exercise jurisdiction over locally regulated utilities.").[23] The District's "undergrounding" term does not violate RCW 35.99.060 and cannot violate CenturyLink's tariff.

Ninth, CenturyLink contends that section 4.4, which purports to immunize the District from liability to CenturyLink or its customers for actual or consequential damages—even for the District's own foreseeable negligence—constitutes "overreaching." However, section 16.1 clarifies that the District is liable for its own negligence and willful misconduct. Furthermore, a witness for CenturyLink testified that the District's indemnification provision was "fair." Accordingly, we are satisfied that the alleged "overreaching" does not run afoul of RCW 54.04.045(2), the common law prohibition of substantively unconscionable terms, or on any other basis require invalidation or severability.

Tenth, CenturyLink contends that the provision of the proposed agreement that requires, in the absence of the District's permission, a four foot minimum distance between the attachers' equipment and the base of the District's poles is unreasonable and illegal. It cites the constitutionally guaranteed right to utilize

_____

[23] It is beyond cavil that tariffs may not repeal or supersede a statute. See People's Org. for Wash. Energy Res. v. Utils. & Transp. Comm'n, 101 Wn.2d 425, 427-34, 679 P.2d 922 (1984).

- 24 -

the right-of-way. WASH. CONST., art. XII, § 19; RCW 80.36.040. That right, however, was guaranteed as against railroad corporations—not public utility districts. WASH. CONST., art. XII, § 19. Moreover, the constitutional provision makes clear that this right is not inviolable: "The legislature shall . . . provide reasonable regulations to give effect to this section." WASH. CONST., art. XII, § 19. Here, the legislature, through RCW 54.04.045, provided public utility districts the authority to regulate pole attachments. Miller testified that the reasons for this buffer area are safety-related. These concerns provided an adequate basis upon which the District could exercise its considerable discretion. There was no error.

Eleventh, CenturyLink contends that it was overreaching for the District to insist upon a "mirror image" agreement, meaning that the agreement purported to offset each pole owned by CenturyLink to which the District attached its equipment with each pole owned by the District to which CenturyLink attached its equipment.[24] This is so, it asserts, because whereas CenturyLink occupies only one foot of any pole owned by the District, the District occupies seven and a half feet of any pole owned by CenturyLink. The District does not respond to this argument. In the absence of evidence to the contrary, we hold that the term was unreasonable. Nevertheless, given that the term does not materially alter the essence of the agreement, it may be severed from the proposed agreement.

Twelfth and finally, CenturyLink contends that, when considered in

---

[24] In a few areas of Pacific County CenturyLink's predecessors erected utility poles to which the District later attached its facilities.

concert, sections 2.10 and 5.12,[25] and Article 11 would mandate removal of its material from the District's poles on unrealistic time frames. However, a CenturyLink witness confirmed that the agreement's timeframes actually provided licensees 60 days longer than the six-month notice that CenturyLink itself requested. We are satisfied that this time frame comports with RCW 54.04.045(2) and is not substantively unconscionable.

While several terms from the proposed agreement are untenable, they are severable from the agreement. The Companies have failed to demonstrate that these scattered, untenable terms—whether considered individually or collectively—are sufficient to render the entire proposed agreement unenforceable. Therefore, although the trial court was incorrect insofar as it concluded that all of the nonrate terms and conditions were valid, we hold that once the offending terms have been severed from the agreement, it is in compliance with RCW 54.04.045(2) and it does not violate the common law prohibition of substantively unconscionable terms.

III

While the Companies did not devote significant space in their merits briefing to arguing that the District's rates in effect prior to the effective date of the 2008 amendment failed to comply with RCW 54.04.045(2), they do appear to have, at the very least, assigned error to the trial court's findings and conclusions

---

[25] A review of the proposed agreement did not reveal the existence of a section corresponding to this number.

to the contrary.[26] However, their argument in support of this allegation, which may charitably be described as cursory, is unpersuasive.

For the same reason as given in Section II.A. of our decision, the District's rates that were calculated and charged prior to the effective date of the 2008 amendment were properly subject to the arbitrary and capricious standard of review by the trial court.

The trial court concluded that "The District's Commissioners adopted pole attachment rates that were just, reasonable, non-discriminatory, and sufficient, those rates being $13.25 prior to January 1, 2008, and $19.70 after January 1, 2008." Conclusions of Law 12. The trial court also concluded that "The District's pole attachment rates both before and after the adoption of Resolution No. 1256 and before and after the 2008 amendment to RCW 54.04.045 were not arbitrary or capricious." Conclusions of Law 29.

Review of the trial court record provides no tenable reason for us to reverse the trial court's conclusion. The record reveals that the District considered a range of potential rates, calculated by reference to four different formulas, before adopting a rate that, in spite of signifying a substantial increase

---

[26] A sympathetic reading of the following assertion indicates that Comcast and Charter, in addition to challenging the District's rate after the 2008 amendment, were challenging the revised rates since their inception: "The [District's] Agreement's proposed rates, and many of its other proposed terms were unjust and unreasonable, contrary to RCW 54.04.045." Additionally, CenturyLink, in its reply brief, argues that by assigning error to a finding of fact by the trial court (33)—which dealt with the legality of the District's revised rates before the 2008 amendment— CenturyLink preserved its right to argue that the rates were not valid prior to the amendment. Nevertheless, because CenturyLink did not present argument in its opening brief in support of its assignment of error, we do not consider CenturyLink's tardy argument first advanced in its reply brief. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

from previous rates, fell below the recommendation made by EES. Moreover, in order to ease the transition for licensees, the District decided to phase in the increased rate incrementally.

In the absence of evidence to the contrary, we affirm the trial court's conclusion that the District's rates prior to the effective date of the 2008 amendment satisfied former RCW 54.04.045(2) and that these rates were not the result of arbitrary and capricious decision making. Because the Companies refused to pay the District's newly instituted rates and because they refused to remove their equipment from the District's poles, they became trespassers on the District's property. In light of the Companies' failure to pay the revised rates and failure to remove their equipment, we affirm the trial court's award of damages for unpaid fees prior to June 12, 2008, as well any damages awarded to compensate the District for the Companies' trespass prior to that date.

IV

The Companies' primary contention on appeal is that the trial court erred by concluding that the 2008 amendment to RCW 54.04.045, which established a procedure for calculating a just and reasonable pole attachment rate, reflected certain preexisting formulas, as identified by the District's consultant and expert witness. This error was induced, the Companies aver, by the trial court's deferential review of the District's post hoc interpretation of the statutory amendment. Had the trial court construed the language of the statute as amended, the Companies argue, it would have necessarily concluded that they reflect different—albeit preexisting—formulas.

We agree that the trial court improperly applied a deferential standard of review to the District's interpretation of the language of the statute. Moreover, we agree that the formulas advanced by the District and accepted by the trial court were inapposite. Yet, the trial court's error does not legitimate the Companies' proposed interpretation. The fact of the matter is that neither the District, nor the Companies, nor the trial court applied the newly minted statutory language in an effort to determine whether the District's rates did, in fact, comply with the unique formula set forth in the 2008 amendment. Instead, both in the trial court and on appeal, all parties labored—often employing tortured reasoning and contortional construction—to show how the unique formula hewed more closely to certain preexisting formulas, while trivializing any distinctive features. Notwithstanding this pervasive yet misguided approach by the parties, it was incumbent upon the trial court to apply the unique formula as written. Owing to its failure to do so, we reverse and remand with instructions to the trial court to apply the unique formula as written and in a manner not inconsistent with our analysis herein.

A

We first address the propriety of the trial court's deferential review. The Companies contend that the trial court, in applying an arbitrary and capricious standard of review, improperly deferred to what the trial court found to be the PUD commission's interpretation of the 2008 amendment to RCW 54.04.045. We agree.

The conclusion of law at issue states, in pertinent part:

The District . . . did not act arbitrarily or capriciously, in interpreting

Section 3(a) of RCW 54.04.045 as the FCC Telecom formula and Section 3(b) as the APPA formula for PUD pole attachment rates as of the date of trial.

Conclusions of Law 11.

This conclusion of law is based on a misperception. The trial testimony was that the PUD commission adopted the $13.25 and $19.70 rates at its January 2, 2007 meeting. This was 17 months before the effective date of the statutory amendment. There is no evidence in the record that the PUD commission (the embodiment of the agency to which any deference, if appropriate, would be given) took *any* action to interpret the 2008 amendment. To the contrary, it was the District's consultant and expert witness, Saleba, who derived the theory upon which the District based its litigation strategy. Thus, in actuality, the trial court applied the arbitrary and capricious test to the testimony of the District's expert witness (not to an action of the PUD commission). In doing so, the trial court erred.

In fact, where a statute sets forth that which is required, an agency possesses no discretion to act in variance to its terms. The legislature passed the 2008 amendment in order to achieve a degree of uniformity. Thus, any preexisting discretion a PUD commission possesses is restricted by the language of the amended statute. A PUD commission has no discretion to set pole attachment rates at variance with the requirements of sections (3)(a), (b), and (c).

B

There are 28 PUDs in Washington. Each PUD commission retains its preexisting discretion with regard to rate-setting *except* as that discretion is

restricted by the amended statute. With regard to the methodology set forth in sections (3)(a), (b), and (c), that methodology must be applied. Uniformity could not be achieved if the courts deferred to 28 different PUD commission interpretations of the meaning of the words in a state statute.

Conversely, with regard to the data applied to the methodology, the PUDs retain their traditional discretion and the courts should continue to defer to the PUDs in this regard.[27]

Thus, the District must set rates by applying the formula set forth in the amended statute. The trial court erred by concluding that the District possessed the discretion to apply two different formulas—even if the District's expert witness believed them to be suitable stand-ins. On the other hand, with regard to the data, assumptions, and other information used to calculate the formula, the District retains the discretion it has long held, given that this discretion was not divested by the 2008 statutory amendment. See, e.g., People's Org. for Wash. Energy Res., 104 Wn.2d at 808 (deference accorded where the statute "in very broad terms, basically just direct[ed] them to set those rates which the agencies determine to be just and reasonable"); Teter v. Clark County, 104 Wn.2d 227, 231, 233, 237-38, 704 P.2d 1171 (1985) (where rates were authorized under the police power, and thus were subject only to the requirement that they "'reasonably tend to correct some evil or promote some interest of the state,'" rates would be sustained "unless it appears, from all the circumstances, that they

---

[27] For instance, the useful life of a utility pole may vary from district to district. So may the average number of attachers. The districts' calculations of such data, and the means and methods by which these calculations are derived, continue to be entitled to deference.

are excessive and disproportionate to the services rendered," so "as to be called arbitrary" (internal quotation marks omitted) (quoting Markham Advertising Co. v. State, 73 Wn.2d 405, 421-22, 439 P.2d 248 (1968))); Prisk v. City of Poulsbo, 46 Wn. App. 793, 804-05, 732 P.2d 1013 (1987) (where rates were required to be uniform, court declined to rule that they "were determined arbitrarily or unfairly"); US W. Commc'ns , Inc. v. Utils. & Transp. Comm'n, 134 Wn.2d 48, 54, 949 P.2d 1321 (1997) (where agency was required to "set rates which are fair, just, reasonable and sufficient," the court utilized an arbitrary and capricious standard of review); Cole v. Wash. Utils. & Transp. Comm'n, 79 Wn.2d 302, 309, 485 P.2d 71 (1971) (where agency was required to set rates which were just, fair, reasonable, and sufficient, the court was to utilize an arbitrary and capricious standard of review).

Given that RCW 54.04.045(3)(a)-(c) sets forth specific instructions for the District to follow, the trial court should have construed the meaning of those instructions without affording deference to the implementing entity. Any deference should have been afforded only to the District's compilation and calculation of the data to which the formula was applied.

C

As noted above, the trial court erred by deferring to the testimony of an expert witness testifying on the District's behalf. Well before the 2008 amendment to RCW 54.04.045, the District hired EES Consulting, Inc., to conduct a pole attachment rate study, the results of which prompted the District to revise its rates. Saleba, the president and chief executive officer of EES, later

testified as an expert witness on behalf of the District. Although the District offered Saleba's testimony at trial—the substance of which reveals an insistence that the validity of the District's rates should be settled by determining which preexisting formula hews most closely to subsection (3)(a) and which preexisting formula hews most closely to subsection (3)(b)—no evidence was presented to the trial court that the PUD commission ever applied the unique formula in the amended statute to determine whether its revised rate was in compliance.

The trial court credited Saleba's testimony and memorialized his approach to interpreting the statute in its conclusions of law. In so doing, the trial court—rather than deferring to an interpretation made by the PUD commission—deferred to an attempt by an expert witness to establish that the legislature did not mean everything that it said when it amended RCW 54.04.045.

This mistake is compounded by the fact that Saleba's approach to statutory interpretation was misguided. Saleba's testimony evinced a disregard for the words of the statute as written by the legislature. Instead of applying the words in subsections (3)(a) and (3)(b), he compared and contrasted each subsection with certain preexisting formulas. As Saleba explained it,

> As a general premise, when asked to review a statute and determine its rate-setting applicability, we take a look at the *options available for the rate calculation* and then compare those rate calculations to the language in the statute. And that's – that's what I did here.
> . . . .
> Again, going back to how I – I do this, I take a look at the statute and then *I compare the language and the various options to that statute.* And the two options I'm looking at in this exhibit and comparing to (3)(a) are the FCC cable and the FCC telecom.

- 33 -

(Emphasis added.)

Accepting that the legislature, in drafting the amendment, was unaware of these preexisting formulas—despite explicitly referencing one of them in RCW 54.04.045(4)[28]—would require, on behalf of the trial court, a willing suspension of disbelief. Yet, by sanctioning Saleba's approach, the trial court, in effect, ruled that while the legislature was aware of these various preexisting formulas, and although it intended to make subsections (3)(a) and (3)(b) reflect two of the established formulas, it instead wrote a unique formula with distinctive features. The trial court erred by accepting Saleba's "closest to the pin" approach to statutory interpretation: a desire to apply preexisting formulas that somewhat fit the language of the statute rather than applying the language of the statute itself.

A number of excerpts from Saleba's testimony further illustrate his misguided approach, which was erroneously legitimated by the trial court.

Saleba testified that RCW 54.04.045(3)(a) reflects the FCC Telecom formula. His reasoning in support of this conclusion contained an unstated, but nevertheless prominent, assumption: subsection (3)(a) must reflect either the FCC Cable formula or the FCC Telecom formula. Working from this assumption, he pointed out that although (3)(a) makes mention of "a share of the required support and clearance space," the Cable formula—in contrast—refers only to "usable space." This difference, according to Saleba, ruled out the possibility that subsection (3)(a) reflects the Cable formula.

I take a look at the statute and then I compare the language and

---

[28] The FCC Cable formula.

> the various options to that statute. And the two options I'm looking at in this exhibit and comparing to (3)(a) are the FCC cable and the FCC telecom. Again, (3)(a) talks about a share of required support and clearance. I take a look at – at FCC cable. It refers to usable space. It doesn't refer to support and clearance.

The merit of Saleba's observation is immaterial. His error stems from his failure to apply the language of the statute as written by the legislature.

Not only did Saleba neglect to apply the language of the unique formula, he inverted the method of determining a just and reasonable rate as prescribed by the legislature. Specifically, he postulated that if subsection (3)(a) reflected the FCC Cable formula, the allocation of bare pole costs between the District and its attachers would be, in his opinion, unreasonable.

> So anyway, I looked at GSS-5, and it showed that using FCC cable would result in a 6 percent allocation of the bare pole cost to the pole attacher. So I envisioned this pole out in the country that's got the PUD on it, and it's got a third-party attacher. And that's it. And I look at that pole and I say, does it seem reasonable to me that the cable people would pick up 6 percent of that – that pole cost and the PUD's other customers 94 percent? And to me that was an unreasonable allocation of cost.
> Q.     Okay. Based on your review of (3)(a), what did – did you – what methodology did you conclude the language in Section (3)(a) represented?
> A.     I concluded it represented the FCC telecom.

Although the language of subsections (3)(a) and (3)(b) is somewhat byzantine, Saleba's transposition defied an uncomplicated directive: "A just and reasonable rate must be calculated as follows: . . . ." RCW 54.04.045(3).

Saleba's misguided approach is further illustrated by his discussion of incremental costs. He testified that because the Cable formula utilizes incremental costs, which are discriminatory—and would therefore violate the

requirement that rates be nondiscriminatory—subsection (3)(a) cannot reflect the Cable formula.

> In rate setting there's a couple of ways people talk about pricing and one is to look at incremental cost and the other is to look at rolled in. Incremental costing is where you would charge somebody based upon just the incremental variable costs associated with providing service.
>
> And I'll use a real life example of maybe a rental property. Let's say that you had a – let's say I had a piece of property that I wanted to use six months and my brother wanted to use six months. Incremental pricing would be where I would charge my brother rental on the other half of the year just predicated on the additional, as an example, electricity and water he might use by using the property, with no contribution to the annual cost associated with the property.
>
> . . . .
>
> Our recommendation was that the reasonable range for pole attachment rates were between the 20.65 calculated from the FCC telecom, with a cap at 36.39 from the APPA method, and we felt the range should be higher, weighted more towards the APPA end, *because the FCC cable, in our view, arbitrarily allocated two-thirds of the unusable space to the electric utility, whereas we felt all users should pay equally in that.*

(Emphasis added.)

> Q.  Okay. So then what – what – we're going to get to what you promote in a minute. But what you're really promoting is a – a formula that results in the – in the attachers providing PUD more money because it's based on a *per capita* rather than a use allocation, right?
> A.  Per capita use is a – my – my – the AP- —
> Q.  "Per capita" I mean per user.
> A.  Correct. That's – yes. Yes, equal proportionality.
> . . . .
> Q.  You don't like the cable 'cause it doesn't do that, right?
> A.  Correct.

Putting aside Saleba's failure to apply the language of subsection (3)(a) as written, it is important to note that the proscription on instituting discriminatory rates prevents PUDs from arbitrarily differentiating between *licensees*; it does

not, however, require that attachers and PUDs split costs equally. RCW 54.04.045(1)(d) ("'Nondiscriminatory' means that pole owners may not arbitrarily differentiate among or between similar classes of licensees approved for attachments."). Moreover, the nondiscriminatory directive deals with the rate as a whole—not the component parts of the rate, such as subsections 3(a) and 3(b). Furthermore, the legislature, by authorizing PUDs to utilize the Cable formula, has already made a determination that the utilization of the Cable formula does not violate the nondiscriminatory requirement. See RCW 54.04.045(4).

In a final effort to corroborate his assessment that subsection (3)(a) does not reflect the Cable formula, Saleba directed the trial court's attention to section (4), which authorizes use of the Cable formula.

> For the purpose of establishing a rate under subsection (3)(a) of this section, the locally regulated utility may establish a rate according to the calculation set forth in subsection (3)(a) of this section or it may establish a rate according to the cable formula set forth by the federal communications commission by rule *as it existed on June 12, 2008, or such subsequent date as may be provided by the federal communications commission by rule, consistent with the purposes of this section.*

RCW 54.04.045(4) (emphasis added). The inclusion of the Cable formula in section (4), according to Saleba, foreclosed the possibility that subsection (3)(a) could reflect the Cable formula.

> Section (4) of the statute says that three – that in the event that – that the local utility has the option of support – of substituting the cable formula – which in this case you're talking about the FCC cable formula – in – in – for Section (3)(a). Which to me says that if Section (3)(a) was meant to be the cable, Section (4) wouldn't be needed. Because Section (4) wouldn't say you can substitute the cable for the cable.

Unsurprisingly, Saleba again neglected to apply the language of subsection (3)(a). However, he also misconstrued section (4).

Contrary to Saleba's assessment, section (4) does not conclusively establish that subsection (3)(a) reflects a formula other than the Cable formula. Instead, section (4) only discloses the legislature's intent to permit PUDs—in the event that the FCC Cable formula was altered between the date that RCW 54.04.045 was amended and the date that the amendment became effective (or subsequently thereafter)—to avail themselves of an updated FCC Cable formula. In order to understand why the legislature included this provision, it is imperative to recognize that the cable television industry is no longer a fledgling industry buttressed by taxpayer subsidies but, rather, a robust industry well-equipped for fiscal autonomy.[29] Given the industry's maturation since the advent of the Cable formula, it was reasonable for the legislature to surmise that the rate calculated using the Cable formula might increase in the future. Indeed, at the time that the legislature amended RCW 54.04.045, the FCC was undertaking a review of its pole attachment rates.[30] Consequently, it is reasonable to conclude that the legislature intended to permit the District to avail itself of a potentially higher rate

---

[29] The trial court found that "The FCC Cable formula was developed to support a fledgling cable TV industry, which is no longer a fledgling industry." Findings of Fact 49.

[30] Implementation of Section 224 of the Act; Amendment of the Commission's Rules and Policies Governing Pole Attachments, WC Docket No. 07-245, FCC 07-187, 22 FCC Rcd. 20195 (proposed Nov. 20, 2007) (to be codified at 47 C.F.R. pt. 1), https://apps.fcc.gov/edocs_public/attachmatch/FCC-07-187A1.pdf.

yielded by the Cable formula,[31] which would further the legislature's explicit intent in amending the statute to "ensure that locally regulated utility customers do not subsidize licensees." ENGROSSED SECOND SUBSTITUTE H.B. 2533. Rather than merely a fortuitous rider to section (4), the option for PUDs to utilize the Cable formula "consistent with the purposes of this section" is revealing of a keen understanding by the legislature of the uncertain regulatory milieu in which it acted.

Moving now to Saleba's examination of subsection (3)(b), he similarly neglected to apply the words of the statute as written by the legislature. Instead, he compared subsection (3)(b) to the Telecom formula and the APPA formula, determined that subsection (3)(b) was more similar to the APPA formula and, thus, concluded that subsection (3)(b) reflects the APPA formula.

> Q.    Can you explain your review of Section (3)(b), please.
> A.    Yes. Again, going back to the language of Section (3)(b), it calls out that support and clearance, or what other people call unusable space, is equally allocated among all locally – among the locally regulated utility and all licensees. And "equal" is the – the – the phrase I'm – I'm focusing on.
> Q.    Okay.
> A.    FCC telecom talks about putting in usable – support and clearance but only two-thirds. I don't see anything in Section (3)(b) that refers to two-thirds of the support facilities. It talks about equally, which to me is all. So – so, therefore, it told me that FCC telecom was not the appropriate formula for Section (3)(b).
> Q.    Did you form an opinion on what methodology the language of Section (3)(b) represented?
> A.    Yes. I then went to the APPA methodology where it talks about equally proportioning among the utilities. The "equally" in the APPA formula and the "equally" in (3)(b) hooked up in my mind,

---

[31] The Senate Bill Report explains that "The bill allows for use of future rate-setting methodologies as set by rule by the FCC." S.B. REP. ON ENGROSSED SECOND SUBSTITUTE H.B. 2533, 60th Leg., Reg. Sess. (Wash. 2008).

which told me that (3)(b) had to be the APPA formulation.

Even if Saleba is correct that subsection (3)(b) more closely resembles the APPA formula, the fact remains that he did not apply the words of subsection (3)(b) as written by the legislature. Had the legislature intended that subsection (3)(b) directly reflect the APPA formula, it would have so indicated.[32] Because it did not, however, it was incumbent upon the District and the trial court to apply the words as written and thereby give meaning to the unique formula conceived by the legislature.

Given the trial court's improper display of deference to the District's expert witness, we conclude not only that the trial court erred by utilizing an arbitrary and capricious standard of review, but that it erred by adopting Saleba's testimony. The legislature's amendment of RCW 54.04.045 included a rate calculating formula that, notwithstanding the legislature's decision to borrow aspects of various preexisting formulas,[33] is unique. Because it was not applied as such, we reverse the trial court's ruling.

D

Nevertheless, it is by no means certain that the trial court's error will result

---

[32] As it did with respect to the FCC Cable formula in section (4).

[33] The sponsor of the 2008 amendment to RCW 54.04.045, Representative John McCoy, made the following comment on the floor of the legislature:

> Thank you, Mr. Speaker. When this bill left this house and went to the other side, it did leave a little bit of work and the senate helped and the state all helped fix that little formula that we had taken a little bit of the FCC formula, a little bit of the APPA, and they came up with an excellent formula . . . .

An audiovisual representation of McCoy's statement was admitted into evidence during the course of the trial.

in the Companies prevailing on remand.[34] The Companies, whether of their own initiative or in response to the District's approach,[35] also failed to apply the unique formula as written by the legislature. Furthermore, to the extent that the Companies did present evidence in support of their alternative interpretation, the trial court found the rate derived by one of their expert witnesses—Patricia Kravtin[36]—to be "unreasonable and impractical."[37] Findings of Fact 34-36. Therefore, on remand, the trial court need not accept the Companies' calculations simply because we reject that which was employed by the District's expert witness and deferred to by the trial court. The Companies will only prevail on remand if the District cannot, after applying the statute as written by the legislature, establish that its rates are just and reasonable, as well as nondiscriminatory and sufficient.

Kravtin adopted a flawed approach similar to that taken by Saleba. Indeed, rather than applying the words of the statute, she instead assumed that subsection (3)(b) reflects the Telecom formula and—working from that assumption—concluded that the Telecom formula may be applied, subject only

---

[34] In this litigation, the Companies have taken an "If he loses, I must win" approach to the issues. As we will discuss, such is not the case—given that this case went to trial and the trier of fact did not choose to credit the testimony of the Companies' expert witnesses.

[35] In the Companies' joint motion for partial summary judgment filed in December 2009, they requested that the trial court determine as a matter of law that subsection (3)(a) functions as the FCC Cable formula and that subsection (3)(b) functions as the FCC Telecom formula.

[36] Kravtin testified on behalf of Comcast and Charter, but not CenturyLink. The trial court found that her opinions "were based primarily on theoretical analysis of economics and public policy, rather than actual local information regarding Pacific County and Pacific PUD." Findings of Fact 35.

[37] The other expert witness, Mark Simonson, testified on behalf of CenturyLink. Simonson's testimony, however, was focused on the nonrate terms and conditions of the District's proposed agreement, and only as they related to CenturyLink. Therefore, his testimony does not provide support for the Companies' position regarding the District's rates.

to a mathematical modification. Although Kravtin's divagation from the statutory text was not so pronounced as Saleba's, it nonetheless betrayed her unsound methodology.

> Q.    Can you tell us what methodology, in your opinion, applies to (3)(b)?
> A.    Yes. In my opinion, the methodology is the telecom formula, with a small modification.
>
> . . . .
>
> Q.    Okay. . . . [C]an you explain how the telecom formula works?
> A.    Yes. The telecom formula works in exactly analogous fashion to the cable formula. In fact, it was based on the cable formula. The same three components we discussed earlier, that I won't repeat.
>       The only difference with regard to the telecom formula is a space allocator. It's now broken into two parts. It has the same useable space. The same allocator is used for useable space, that proportional allocator, but then for unusable space, that space, subject to a two-thirds adjustment, is divided equally by the number of attachers.

The legislature, in amending RCW 54.04.045, wrote a singular rate formula. Even assuming, without deciding, that a substantial overlap exists between the FCC Telecom formula and subsection (3)(b), it is nevertheless clear—and, indeed, the parties do not dispute—that the two are not identical. While Kravtin's switch-and-bait approach to construing the statute may hold superficial appeal, it is improper.[38]

---

[38] Additionally, the trial court found that the rate derived by Kravtin was unreasonable and impractical based, in part, on the local information lacking from her proposed rate. Findings of Fact 35 ("The opinions of Defendants' rate expert, Patricia Kravtin, were based primarily on theoretical analysis of economics and public policy, rather than actual local information regarding Pacific County and Pacific PUD. She had never visited Pacific County prior to trial."); Findings of Fact 34 ("The pole attachment rate derived by Defendant's expert witness, Patricia Kravtin, is unreasonable and impractical as it relates to this case.").

An example of Kravtin's lack of local information is her conclusion that transmission poles should not be considered by the District in setting a rate, despite the fact that there were attachments by the Companies to a majority of the District's transmission poles. On the subject

E

While we hold that the trial court, on remand, must interpret the unique rate formula based on the words of the statute and not based on opinions as to what formulas it appears to resemble, we must repeat that because the formula is not designed to ensure mathematical certainty and because the District enjoyed ample discretion prior to the 2008 amendment, the District retains considerable discretion in its rate calculation. Although our directive to the trial court, unadorned, is that the statute must be applied as written, the legislature's amendment of RCW 54.04.045 did not fully divest the District of the previously liberal discretion it enjoyed. What follows is a nonexhaustive list of the discretion retained by the District in calculating a just and reasonable rate.

Both subsections (3)(a) and (3)(b) contain the phrase "shall consist of the additional *costs* of procuring and maintaining pole attachments, but may not exceed the actual capital and operating *expenses* of the locally regulated utility . . . ." RCW 54.04.045(3)(a)-(b) (emphasis added). However, neither subsection clarifies whether these costs and expenses are treated as gross costs and expenses or net costs and expenses. Nevertheless, the legislature explicitly

---

of transmission poles, CenturyLink assigned error to the trial court's finding that "Including District transmission poles, as well as distribution poles, in the District's rate calculations was reasonable." Findings of Fact 38. However, its critique is based on the fact that no preexisting formulas authorize the use of transmission poles in calculating rates. As should be clear by now, we reject this approach and, in light of the Companies' common practice of attaching to the District's transmission poles, rule that the trial court's finding was supported by substantial evidence.

An example of Kravtin's unreasonable and impractical rate derivation is the deduction she made for costs that benefit only the District. For example, she addressed the "cross arms" on a pole, which do not benefit the attachers. According to Kravtin, pursuant to the FCC Cable and Telecom formulas, it is appropriate to deduct 15 percent from the District's account to offset costs stemming from features that do not benefit the attachers. However, no such deduction is authorized by the rate formula authored by the legislature.

intended the 2008 amendment "to recognize the value of the infrastructure of locally regulated utilities" and to "ensure that locally regulated utility customers do not subsidize licensees." ENGROSSED SECOND SUBSTITUTE H.B. 2533. Therefore, the District retains discretion to determine, after calculating a rate pursuant to both gross costs and expenses and net costs and expenses, which result best advances the policy explicated by the legislature.

The District also retains discretion to determine whether to designate a portion of the pole as unusable "safety space" and, if it does so, whether to require the Companies to bear a share of the cost associated with the unusable space.[39] In both subsections (3)(a) and (3)(b), the legislature directs PUDs to consider a "share" of the "required support and clearance space." In pole attachment vernacular, another term for "support and clearance space" is unusable space. However, the legislature did not define that which constitutes a proper share and it did not define that which constitutes unusable space. Rather than providing evidence as to which preexisting formula hews most closely to these subsections, the absence of further definition affords the District discretion to determine that which constitutes unusable space and, further, what share of the cost associated with the unusable space should be borne by the attachers.[40]

---

[39] The Companies assign error to a finding made by the trial court regarding the safety space: "Defendants use the safety space on the District's poles, and the safety space is primarily for their benefit." Findings of Fact 39. However, the District points to numerous instances in the record of testimony that supports these findings. Accordingly, we conclude that the trial court's finding was supported by substantial evidence. See 224 Westlake, LLC, 169 Wn. App. at 720 ("We review the trial court's decision following a bench trial to determine whether the findings of fact are supported by substantial evidence and whether those findings support the conclusions of law.").

[40] Again, this discretion is guided by the legislature's statement of intent.

Instituting a policy of not using the safety space is a prerogative of the District both as a rate maker and as a utility operator.

The District also retains discretion in the manner in which it calculates the number of licensees that attach per pole. The District calculated that, on average, there were 2.38 attachers per pole owned by the District. On the other hand, the Companies offered Kravtin's testimony that, pursuant to the federal formulas, the number of attachers must be assumed to be three. However, because the formula created by the legislature is unique, it was not incumbent upon the District to assume that there were three attachers per pole; instead, it could avail itself of data derived by surveys conducted by its employees or agents in order to estimate the actual number of attachers. This approach is in harmony with the legislature's stated intent that the amendment "ensure that locally regulated utility customers do not subsidize licensees." ENGROSSED SECOND SUBSTITUTE H.B. 2533. If the District were to assume the presence of three attachers per pole, this input would ultimately lower the rate, which would, in turn, impose a higher financial burden on the District's customers.[41]

In sum, we reverse the trial court's determination that subsection (3)(a) reflects the FCC Telecom formula and that subsection (3)(b) reflects the APPA formula and remand for further proceedings. On remand, the District must apply the statute as written to the relevant data, albeit subject to the discretion that was not withdrawn by the 2008 amendment. Only after receiving evidence and

---

[41] Indeed, Kravtin's insistence that the FCC "3 attacher per pole" presumption be used, rather than actual data from the operation of the Pacific PUD, appears to be one basis for the trial court's finding that her testimony was not worthy of belief.

testimony based both on a proper application of the amended statute and on underlying data that, in the trial court's view, is worthy of being credited, may the trial court determine whether the District's revised rates are, in addition to the other requirements imposed by RCW 54.04.045, "just and reasonable."

V

Comcast and Charter both challenge the trial court's award of damages to the District, alleging that its prejudgment interest award was inaccurate. Specifically, they argue that, in the event that we affirm the trial court's ruling in any respect, the amount of the prejudgment interest award should be offset to account for the District's failure to mitigate its damages, as well as the trial court's failure to calculate the award at an interest rate of five percent per annum. We disagree.

"We review a prejudgment interest award for abuse of discretion." Unigard Ins. Co. v. Mut. of Enumclaw Ins. Co., 160 Wn. App. 912, 925, 250 P.3d 121 (2011). "Under this standard, we reverse a trial court's decision only if it 'is manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons. Untenable reasons include errors of law.'" Humphrey Indus., Ltd. v. Clay St. Assocs., LLC, 176 Wn.2d 662, 672, 295 P.3d 231 (2013) (quoting Noble v. Safe Harbor Family Pres. Trust, 167 Wn.2d 11, 17, 216 P.3d 1007 (2009)).

"Prejudgment interest compensates a plaintiff for the 'use value' of damages incurred from the time of the loss until the date of judgment." Humphrey Indus., 176 Wn.2d at 672; see also Polygon Nw. Co. v. Am. Nat'l Fire

- 46 -

Ins. Co., 143 Wn. App. 753, 793, 189 P.3d 777 (2008) ("[A]n award of prejudgment interest is in the nature of preventing the unjust enrichment of the defendant who has wrongfully delayed payment."). Prejudgment interest may be awarded "(1) when an amount claimed is 'liquidated' or (2) when the amount of an 'unliquidated' claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion." Prier v. Refrigeration Eng'g Co., 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A liquidated claim is "one where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." Prier, 74 Wn.2d at 32.

Comcast and Charter first contend that the District failed to mitigate its damages. In support of their contention, they point out that the District has refused to accept their annual offer of payment at the historic rate, despite the inclusion of a reservation of the District's right to collect the difference between payment tendered at the historic rates and the District's newly instituted rates, pending the outcome of the litigation between them. Their contention is unavailing.

"The doctrine of mitigation of damages," which generally applies in both contract and tort cases, "prevents recovery for those damages the injured party could have avoided by reasonable efforts taken after the wrong was committed." Bernsen v. Big Bend Elec. Coop., Inc., 68 Wn. App. 427, 433, 842 P.2d 1047 (1993); cf. Desimone v. Mut. Materials Co., 23 Wn.2d 876, 884, 162 P.2d 808

(1945) ("[T]he requirement of minimizing damages does not apply to cases . . . of intentional or continuing torts."). When the injured party is presented with a choice between two reasonable courses, however, "*the person whose wrong forced the choice cannot complain that one rather than the other is chosen.*'" Hogland v. Klein, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956) (quoting CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 35, AT 133-34 (1935)). Indeed, "'the plaintiff is not bound at his peril to know the best thing to do.'" Hogland, 49 Wn.2d at 221 (quoting 1 THEODORE SEDGWICK ET AL., A TREATISE ON THE MEASURE OF DAMAGES § 221, at 415 (9th ed. 1912)). Furthermore, "[t]he party whose wrongful conduct caused the damages . . . has the burden of proving the failure to mitigate." Cobb v. Snohomish County, 86 Wn. App. 223, 230, 935 P.2d 1384 (1997).

As an initial matter, any prejudgment interest that was calculated based on damages caused by the Companies' trespass is not susceptible to attack by way of alleging that the District failed to mitigate its damages. Although damages must be mitigated in most tort cases, damages resulting from an intentional tort need not be. Bernsen, 68 Wn. App. at 433. Given that trespass is an intentional tort, Broughton Lumber Co. v. BNSF Ry. Co., 174 Wn.2d 619, 630 n.9, 278 P.3d 173 (2012), it was not incumbent upon the District to mitigate damages stemming from the Companies' trespass.

Turning now to damages awarded for breach of contractual obligations, Comcast and Charter contend that the District failed to mitigate its damages by

refusing to accept their annual offers of payment at the historic rate, which, they aver, included the reservation of rights noted above.

Although the jointly filed briefing of Comcast and Charter contains argument to the effect that both Comcast and Charter tendered payment at the historic rates—*including* a reservation of rights—their citations to the record only reveal an attempt by Charter to include a reservation of rights in its tender.[42]

Contrary to Comcast's and Charter's contention, the District's refusal of its offer does not constitute a failure to mitigate damages. Had the District accepted Comcast's and Charter's offers of payment at the historic rate, it would have been receiving annual payment of $19.70 per pole from two attachers,[43,][44] $5.75 per pole from Comcast and Charter, and no money from CenturyLink.[45] By receiving different rates from its licensees, the District would have risked running afoul of the legislature's directive that rates received by the District be nondiscriminatory.[46]

---

[42] As explained supra at n.8, we found no evidence of Exhibit 515 being admitted at trial or included in the record. However, even if Comcast and Charter were correct insofar as they aver that Comcast's tender of payment included a reservation of rights, for the reasons stated below, we would not hold that the District's refusal of such an offer constituted a failure to mitigate damages.

[43] "Two other companies besides Defendants which have pole attachments on the District's poles have been paying at the rates the District adopted in Resolution No. 1256 since it was put into effect in 2007." Findings of Fact 44. Because the Companies do not offer any argument as to why this finding is not supported by the evidence, we regard it as a verity on appeal. See, e.g., Karlberg v. Otten, 167 Wn. App. 522, 525 n.1, 280 P.3d 1123 (2012) ("It is incumbent on counsel to present the court with argument as to why specific findings of the trial court are not supported by the evidence and to cite to the record to support that argument." (quoting In re Estate of Lint, 135 Wn.2d 518, 531-32, 957 P.2d 755 (1998))).

[44] It would have received $13.25 per pole from these two attachers in 2007 and $19.70 per pole from each in 2008.

[45] CenturyLink does not contend that its attempt to secure an accord and satisfaction led to a failure by the District to mitigate its damages.

[46] By receiving different rates from different licensees, the District would have risked contravening an additional legislative directive contained in section (2): "A locally regulated utility

"All rates, terms, and conditions made, demanded, or received by a locally regulated utility for attachments to it poles must be just, reasonable, nondiscriminatory, and sufficient." RCW 54.04.045(2). "'Nondiscriminatory' means that pole owners may not arbitrarily differentiate among or between similar classes of licensees approved for attachments." RCW 54.04.045(1)(d).

Had the District accepted a significantly reduced rate from Comcast and Charter—both of which were trespassing—while concomitantly receiving its newly instituted rate from two other attachers, the District would have been receiving different rates from different licensees. In the absence of further legislative guidance or judicial construction, the fact that the offer from Charter included a reservation of the District's right to collect the difference between payment tendered at the historic rate and at the revised rate—in the event that the District prevailed in this litigation—was no guarantee for the District that, by accepting, it could maintain compliance with the nondiscriminatory requirement.

Furthermore, had the District accepted Comcast's and Charter's offers, it would have sent a message to the two attachers dutifully paying the new rate that they were being overcharged or, at the very least, that there were economic incentives to breach their agreements with the District. Moreover, in the absence of contrary authority, it would have been reasonable for the District to conclude that acceptance of the offers from Comcast and Charter would result in a violation of the requirement that rates received be "sufficient." The lack of further

---

shall levy attachment space rental rates that are uniform for the same class of service within the locally regulated utility service area." RCW 54.04.045(2).

definition of this term in the statute would have left the District with no guidance as to whether it was in compliance with the statute.

Given the uncertainty as to whether the District could accept the offers of Comcast and Charter while still complying with RCW 54.04.045(2), coupled with the prospect of incentivizing other licensees to breach their agreements, we conclude that the District's refusal constituted a reasonable course of action, which may not be scrutinized after the fact by the parties which forced the choice. See Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 840, 100 P.3d 791 (2004). Although we do not here purport to chart the depth and breadth of what action constitutes "reasonable efforts" to prevent avoidable damages, there can be no doubt that the definition excludes assuming the risk of contravening a legislative mandate, while incentivizing other licensees to breach their agreements and become trespassers. The District did not fail to mitigate its damages.

If the Companies wished to avoid the risk of having to pay prejudgment interest, but still desired to withhold from the District the contested sum until their dispute was resolved, they should have paid that sum into the Pacific County Superior Court's registry. See Colonial Imports v. Carlton Nw., Inc., 83 Wn. App. 229, 248, 921 P.2d 575 (1996) (Baker, C.J., dissenting) ("If a defendant wishes to protect itself against the prejudgment interest rate provided by statute, all the defendant need do is pay into the registry of the court that amount which the defendant believes is the proper judgment amount. By doing so, prejudgment interest is tolled on the amount deposited."). Indeed, given that the policy undergirding prejudgment interest as a permissible form of damages "'has been

based upon the view that one who has had the use of money owing to another should in justice make compensation for its wrongful detention,'" Prier, 74 Wn.2d at 32 (quoting McCORMICK, supra, § 54), had the Companies paid into the registry of the court the amount they believed to be in dispute, they would not have had the use of that amount prior to the adverse judgment and, accordingly, any prejudgment interest on the amount deposited would have been tolled.

Comcast and Charter next contend that the trial court incorrectly calculated prejudgment interest at a rate of 12 percent per annum. This is so, they assert, because (1) the trial court justified the 12 percent interest rate based on RCW 4.56.110(4), which only addresses the interest rate that accrues from the entry of a judgment; (2) the proposed agreement from the District could not be taken into account, given that it was unsigned; and (3) the District's own rate expert calculated damages based on an interest rate of five percent. Their contention is unavailing.

"Prejudgment interest is allowed in civil litigation at the statutory judgment interest rate." Unigard Ins. Co., 160 Wn. App. at 925. RCW 4.56.110 "sets the rate for four categories of judgments: (1) breach of contract where an interest rate is specified, (2) child support, (3) tort claims, and (4) all other claims." Unigard Ins. Co., 160 Wn. App. at 925 (footnote omitted). "In determining the appropriate interest rate, a court should examine the component parts of the judgment, determine what the judgment is primarily based on, and apply the appropriate category." Unigard Ins. Co., 160 Wn. App. at 925.

None of Comcast's and Charter's assertions provide a basis upon which

we could conclude that the trial court abused its discretion in calculating prejudgment interest at a rate of 12 percent per annum. Their first assertion is foreclosed by well-established precedent, which makes clear that "[p]rejudgment interest is allowed in civil litigation at the statutory judgment interest rate." Unigard Ins. Co., 160 Wn. App. at 925. Thus, it is a proper exercise of discretion for a trial court to calculate prejudgment interest in a civil dispute at the statutory judgment interest rate reflected in RCW 4.56.110. Given this, regardless of whether the trial court improperly made reference to or relied upon an 18 percent interest rate contained in the unsigned agreement proposed by the District—their second assertion—and regardless of the five percent interest rate calculated by the District's own rate expert—the basis for their third assertion—so long as the trial court utilized a rate that was consistent with RCW 4.56.110, there was no abuse of discretion. Although this action was predicated, in part, on breach of contract claims, no interest rate was specified in the contracts. Thus, the trial court applied RCW 4.56.110(4) and settled on a rate of 12 percent interest per annum. Twelve percent is within the permissible range of interest rates pursuant to RCW 4.56.110(4).[47] See RCW 19.52.020. Accordingly, the trial court did not

---

[47] The ceiling for permissible interest rates is set by RCW 19.52.020(1), which is incorporated by reference in RCW 4.56.110(4) and which states:
> (1) Any rate of interest shall be legal so long as the rate of interest does not exceed the higher of: (a) Twelve percent per annum; or (b) four percentage points above the equivalent coupon issue yield (as published by the Board of Governors of the Federal Reserve System) of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the later of (i) the establishment of the interest rate by written agreement of the parties to the contract, or (ii) any adjustment in the interest rate in the case of a written agreement permitting an adjustment in the interest rate.

abuse its discretion.

## VI

The District seeks affirmance of the award of attorney fees and expenses granted to it in the trial court and an award of attorney fees and costs on appeal. First, it argues that, as the prevailing party, the trial court properly awarded it fees and expenses. Second, it argues that it should be awarded fees and costs on appeal. Third, it argues that it is entitled to an award of attorney fees based on the Companies' untimely appeal. The Companies contest all such claims.

## A

The District first contends that it was properly awarded attorney fees and expenses in the trial court. With regard to the District's fees and expenses in connection with the nonrate terms and conditions, as well as the District's rates prior to June 12, 2008, we agree. However, as the District may not be the prevailing party on remand with regard to the issue of whether its rate complied with the 2008 amendment to RCW 54.04.045, it is premature to say that it is entitled to an award of fees and expenses in the trial court as to that issue.

Whether there is a legal basis for awarding attorney fees is reviewed de novo; however, a discretionary decision to award fees and expenses—and the reasonableness of such an award—is reviewed for abuse of discretion. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

"Washington follows the American rule 'that attorney fees are not recoverable by the prevailing party as costs of litigation unless the recovery of

---

RCW 19.52.020(1).

- 54 -

such fees is permitted by contract, statute, or some recognized ground in equity.'" Panorama Vill. Condo. Owners Ass'n Bd. of Directors v. Allstate Ins. Co., 144 Wn.2d 130, 143, 26 P.3d 910 (2001) (quoting McGreevy v. Or. Mut. Ins. Co., 128 Wn.2d 26, 35 n.8, 904 P.2d 731 (1995)). "In general, a prevailing party is one who receives an affirmative judgment in his or her favor." Riss v. Angel, 131 Wn.2d 612, 633, 934 P.2d 669 (1997). "Contractual provisions awarding attorney fees to the prevailing party also support an award of appellate attorney fees." City of Puyallup v. Hogan, 168 Wn. App. 406, 430, 277 P.3d 49 (2012).

In light of our holding with regard to the nonrate terms and conditions and the validity of the District's rates prior to June 12, 2008, the District is properly considered the prevailing party as to those issues in the trial court and was, accordingly, entitled to an award of fees as to those issues. However, whether an award of fees in conjunction with the rates controlled by the amended statute is appropriate must abide further proceedings.

With regard to the trial court's award of expenses, we reach a similar conclusion. In response to the trial court's award of expenses to the District, Comcast and Charter[48] aver that the portion of the award given to compensate

---

[48] In its opening brief, CenturyLink did not challenge the trial court's award of expenses as to the work done by EES. In its reply brief, it states, "CenturyLink continues to join in all arguments made by co-defendants Comcast and Charter on the issues of damages and the awards to the District of attorneys' fees and costs." To the extent that this statement could be interpreted as an attempt by CenturyLink to challenge the trial court's award of expenses, we do not consider its challenge. See Cowiche Canyon Conservancy, 118 Wn.2d at 809 ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

Moreover, CenturyLink did not, in its merits briefing, indicate the number of hours billed by its expert witness in connection with this litigation or the hourly rate charged by its expert, or direct us to a place in the record, the verbatim report of proceedings, or elsewhere in the materials designated by the parties, where we could obtain this information. The effect of this is

the District for the expenses it incurred through the use of services provided by EES should be reversed. This is so, they contend, because EES provided both rate analysis services to the District prior to this litigation and litigation-related services (including Saleba's expert testimony) after this litigation had commenced. Comcast and Charter assert that the invoices that were submitted to the trial court failed to specify the nature of the work that formed the basis for the amount charged in the bill, which removed any indicia of reliability from the trial court's subsequent determination that the expenses were, in fact, litigation-related. We disagree.

The trial court made the following pertinent finding with respect to its award of expenses:

> The fees and expenses of EES Consulting totaling $251,150.11 billed to and paid by the District are reasonable expenses incurred in connection with this lawsuit. They were paid directly by the District to EES Consulting for expert witness work, and the documentation is sufficient to enable the Court to make this determination. The EES Consulting expenses are awarded to the District.

Contrary to Comcast's and Charter's contention, the record supports the trial court's finding. While the invoices submitted to the District by EES did not explicitly describe the nature of the work undertaken by EES, every bill was invoiced on a date that was subsequent to both the date that this litigation was commenced and the effective date of the 2008 amendment to RCW 54.04.045. Given that EES had long since completed the rate study for which it had been

---

to preclude us, as part of our subsequent consideration of the reasonableness of the expenses incurred by the District with regard to EES, from also considering the hourly rate charged by CenturyLink's expert witness, as well as the number of hours for which CenturyLink was invoiced.

retained by the District, it was reasonable for the trial court to conclude that these invoices reflected work done by EES in connection with this litigation.

Alternatively, Comcast and Charter[49] argue that the award of expenses must be reversed because it was unreasonably high. In support of this argument, they reference the difference between the hours billed by their expert witness Kravtin and the hours billed by EES. We find their argument unpersuasive.[50]

The record supports the trial court's finding that the expenses incurred were reasonable. Kravtin devoted approximately 270 hours of work in connection with this litigation. EES, on the other hand, devoted nearly 1,400 hours of work in connection with this litigation. However, Kravtin's hourly rate of $375.00 was nearly twice that of Saleba's hourly rate of $200.00, whose hourly rate was higher than that of any other employee of EES who provided litigation-related services to the District.[51] Furthermore, Saleba's testimony addressed

---

[49] In its opening brief, CenturyLink, in a footnote, states that it "adheres to the arguments made below regarding the impropriety of the nature and amount of the District's claimed fees and costs, particularly the District's exorbitant expert witness fees." However, we decline to consider this cursory assertion as proper appellate argument, particularly given CenturyLink's attempt to rely on argument presented to the trial court by incorporating it by reference rather than presenting a reasoned argument in its merits brief. See Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 497, 254 P.3d 835 (2011) ("'placing an argument . . . in a footnote is, at best, ambiguous or equivocal as to whether the issue is truly intended to be part of the appeal'" (internal quotation marks omitted) (quoting St. Joseph Gen. Hosp. v. Dep't of Revenue, 158 Wn. App. 450, 473, 242 P.3d 897 (2010), modified on remand, 165 Wn. App. 23, 267 P.3d 1018 (2011))); see Diversified Wood Recycling, Inc. v. Johnson, 161 Wn. App. 859, 890, 251 P.3d 293 (2011) ("We do not permit litigants to use incorporation by reference as a means to argue on appeal or to escape the page limits for briefs set forth in RAP 10.4(b).").

[50] Although a request for an award of attorney fees must reflect a lodestar method calculation, there is no such requirement with regard to the work of other professionals. The trial court may consider any competent evidence in reaching its determination.

[51] The invoices reveal that other employees of EES, whose hourly rates were lower than Saleba's, provided services to the District. These employees include the following: Anne Falcon (hourly rate of $190.00), Kelly Tarp (hourly rate of $160.00), Seung Kim (hourly rate of $160.00),

both the validity of the District's rates and the validity of its nonrate terms and conditions, whereas Kravtin's testimony merely addressed the validity of the District's rates. An inference arising from the significantly higher rate charged by Kravtin when compared to that which was charged by Saleba (or any other employee of EES) is that Kravtin's hourly yield was commensurate with her increased hourly rate. That inference, considered together with the broader scope of the testimony that was given by Saleba during the course of the trial, indicates that the trial court's finding was adequately supported by evidence contained in the record. Comcast and Charter have offered no basis for us to conclude that the trial court's award of expenses was unreasonable.

In view of our foregoing analysis, we conclude that, in the event that the District prevails on remand, the award of expenses should not be disturbed. Both the basis for and the reasonableness of the trial court's finding were adequately supported by the record. However, in the event that the Companies prevail on remand, the award of expenses will need to be reassessed in the following manner: the trial court will be required to identify and segregate the amount of expenses to award based on the work done by EES with regard to the issues on which the District prevailed, while not awarding expenses on the issue on which the District did not prevail. In any event, given our affirmance of the trial court's ruling with regard to the nonrate terms and conditions and the revised rates prior to June 12, 2008, an award of expenses that were related to litigation

---

Amber Gschwend (hourly rate of $140.00), Lisa Fortney (hourly rate of $140.00), Amber Nyquist (hourly rate of $140.00), Janet White (hourly rate of $140.00) Sarah Neubauer (hourly rate of $120.00), and Diane Running (hourly rate of $120.00).

of those issues was proper.

B

The District next contends that it is entitled to an award of attorney fees and costs on appeal. Because this case is to be remanded, we delegate to the trial court, after final resolution of the merits, the question of an award of fees and costs on appeal. With regard to the nonrate issues, an award of fees is appropriate. With regard to the rates assessed prior to June 12, 2008, an award of fees is appropriate. However, with regard to the rates assessed on or after June 12, 2008, an award of fees will be appropriate only in the event that the District is the ultimate prevailing party on that issue.

C

The District next contends that it is entitled to an award of attorney fees and costs relating to the Companies' untimely appeal. This is so, it avers, because fees and costs "would not have been incurred by the district but for the Companies' failure" to appeal within the requisite period.

Review of this issue is problematic because it was briefed opaquely: the parties either do not cite to the record, cite to things outside of the record, or cite to things which may be in the record but with a citation that fails to identify where in the voluminous record it may be contained. What seems to be clear is this: the District (1) is requesting that we affirm the trial court's award of attorney fees and costs for its opposition to the Companies' motion to vacate and reenter final judgment in the trial court, and (2) is seeking an award of attorney fees and costs

with respect to the Companies' motion for extension of time, the District's motion to stay, and the District's motion for discretionary review.

With respect to the first request, we affirm the trial court's award. The District sensibly notes that because the Companies did not appeal the trial court's denial of their motion to vacate, the District is the prevailing party. The Companies do not dispute this in their briefing, and because the District prevailed on a motion that will not be reversed (or even challenged, presumably) on remand, we affirm the trial court's award of attorney fees and expenses relating to the Companies' motion to vacate.

With respect to the second request, the District argues that the "same principles applicable to the award of fees and costs" relating to the motion to vacate apply to the Companies' motion for extension of time, the District's motion to stay, and the District's motion for discretionary review by the Supreme Court. Not so. Because the District is, at this stage, only a partially prevailing party, we direct the trial court to consider this request on remand, after the merits of all substantive claims are resolved.

The District argues, alternatively, that we should impose terms or compensatory damages—or both—as provided for by RAP 18.9, which allows a court to sanction a party for its failure to comply with RAP 5.2(a), which requires filing of a notice of appeal to be done within 30 days of entry of judgment. In response, the Companies assert that Division Two already declined to award the District any fees on this basis. Although the Companies do not cite any Division Two ruling to this effect, we decline to sanction the Companies pursuant to RAP

18.9(a).

## VII

In the complaints filed to commence these actions, the District requested equitable relief in the form of an injunction, which was granted by the trial court and memorialized in its conclusions of law.

> 45. In addition to the declaratory judgment, damages, and interest awarded, the District is entitled to the injunctive relief requested.
> 46. Defendants must start paying at the District's rates as set forth in Resolution No. 1256 and must enter into the District's proposed Pole Attachment Agreement (with revisions per Conclusion of Law 35 above), or they must remove their attachments from District poles within thirty (30) days, and if not so removed, the District may remove Defendants' attachments at Defendants' expense.

We affirm the trial court's ruling with regard to the nonrate terms and conditions and the District's revised rates prior to June 12, 2008. The trial court's grant of injunctive relief is supported by these holdings. When the Companies refused to sign the proposed agreement, refused to remove their equipment from the District's poles, and refused to pay the revised rates commencing January 1, 2007, they became trespassers on the District's property. Thus, insofar as the trial court based its grant of equitable relief upon the Companies' refusal to sign the agreement, remove their equipment, and pay the initial revised rates, the trial court's ruling was proper. However, because we remand for resolution of the propriety of the revised rates following the effective date of the amendment, we direct the trial court on remand to consider whether it should modify its grant of equitable relief, either on an interim basis or otherwise.

VIII

The Companies contend that they are entitled to an award of attorney fees on appeal. This is so, they assert, because the reciprocal fee-shifting provision of RCW 4.84.330 entitles them, as prevailing parties, to attorney fees. However, because we reverse and remand to the trial court for further proceedings, it is, at best, premature to determine that any of the Companies are entitled to an award of attorney fees. Nevertheless, we provide guidance to the trial court with respect to the Companies' argument.

The statute upon which the Companies rely is as follows:

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.

RCW 4.84.330.

As an initial matter, CenturyLink will be precluded from securing attorney fees pursuant to this statute. This is so because the only contract upon which CenturyLink could sue is a contract from 1969, which was entered into before the reciprocal fee shifting provisions became effective.[52]

Nevertheless, CenturyLink cites this court's decision in Herzog Aluminum, Inc. v. General American Window Corp., 39 Wn. App. 188, 692 P.2d 867 (1984), for the proposition that RCW 4.84.330 applies to "any action" on a contract, even when the claimed contract is found to have never been formed. This is an overly

---

[52] Indeed, CenturyLink seeks fees pursuant to that contract.

expansive reading of Herzog Aluminum, where we held "that the broad language '[i]n any action on a contract' found in RCW 4.84.330 encompasses any action in which it is alleged that a person is liable on a contract." 39 Wn. App. at 197 (alteration in original). Indeed, Division Two rejected a similar argument in Wallace v. Kuehner, 111 Wn. App. 809, 46 P.3d 823 (2002). In that case, Division Two declined to apply Herzog Aluminum to an instance in which the parties seeking attorney fees never intended to form a contract. Wallace, 111 Wn. App. at 820 (distinguishing cases in which the parties intended to form a contract, but due to lack of a meeting of the minds, mutual mistake, or statute of limitations, the contract was not enforceable). Similarly, CenturyLink never intended to form a contract with the District and so it may not avail itself of a provision from the proposed agreement that it rejected in order to capitalize on the reciprocal fee shifting provision authorized by RCW 4.84.330.

However, CenturyLink contends that a new contract was formed in 1987. This is so, it asserts, because a party to a terminable at will contract can unilaterally modify an existing contract, and because the 1969 contract was modified in 1987 when the parties agreed to a new rate, that modification constitutes a new contract for purposes of RCW 4.84.330. In support of this, CenturyLink relies on Cascade Auto Glass, Inc. v. Progressive Casualty Insurance Co., 135 Wn. App. 760, 145 P.3d 1253 (2006). However, that case involved unilateral modification to an existing contract. See Cascade Auto Glass, 135 Wn. App. at 769. Here, admittedly, "the parties agreed to a new rate." Therefore, Cascade Auto Glass is inapposite.

Finally, CenturyLink contends that it is entitled to fees on equitable grounds. Specifically, it asks that we apply the equitable principle of mutuality of remedies. Although Washington courts have applied this principle, Kaintz v. PLG, Inc., 147 Wn. App. 782, 197 P.3d 710 (2008), Mt. Hood Bev. Co v. Constellation Brands, Inc., 149 Wn.2d 98, 63 P.3d 779 (2003), Park v. Ross Edwards, Inc., 41 Wn. App. 833, 706 P.2d 1097 (1985), those decisions were reached where bilateral attorney fees provisions precluded RCW 4.84.330 from applying (Park and Kaintz) and where a different statute applied (Mt. Hood Bev. Co.). Thus, where other contractual or statutory provisions have rendered RCW 4.84.330 inapposite, courts have sometimes applied the equitable principle of mutuality of remedies. No such provisions are present here. The statute only permits reciprocal fee shifting for contracts entered into after September 21, 1977. Applying the equitable remedy requested here would be tantamount to excising words from the statute and, even more troubling, would risk allowing the equitable remedy to swallow the statutory rule. We decline to award fees to CenturyLink on equitable grounds.

Comcast and Charter also seek attorney fees on appeal pursuant to prior contracts with the District. Just as CenturyLink does, they assert that the reciprocal fee-shifting provision of RCW 4.84.330 entitles them, as prevailing parties, to attorney fees. Unlike CenturyLink's contract, however, both Comcast's and Charter's contracts were entered into after September 21, 1977. Accordingly, if, on remand, they are prevailing parties, then they will be able to

avail themselves of the reciprocal fee-shifting provision in RCW 4.84.330.[53]

Affirmed in part. Reversed and remanded in part.

We concur:

---

[53] Keeping in mind, of course, that the District is already the prevailing party with regard to the litigation over the nonrate terms and the rate charged through June 12, 2008.