# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| EDNA ALLEN, an individual, and MANUFACTURED HOUSING DISPUTE RESOLUTION PROGRAM, WASHINGTON STATE ATTORNEY GENERAL'S OFFICE, | No. 49836-7-II |
| Respondents, | |
| v. | |
| DAN AND BILL'S RV PARK, | PUBLISHED OPINION |
| Appellant. | |

LEE, J. — This appeal concerns the statutory interpretation of "park model" under the Manufactured/Mobile Home Landlord-Tenant Act (MHLTA). " 'Park model' means a recreational vehicle intended for permanent or semi-permanent installation and is used as a primary residence[.]" RCW 59.20.030(14). The MHTLA applies only to mobile home parks containing two or more park models.

Edna Allen filed a complaint against Dan and Bill's RV Park (the Park) with the Manufactured Housing Dispute Resolution Program (the Program),[1] alleging that the Park violated

---

[1] The Manufactured Housing Dispute Resolution Program is created by statute and administered by the Attorney General's Office. RCW 59.30.030(1). The program has the authority to "[p]erform dispute resolution activities, including investigations, negotiations, determinations of violations, and imposition of fines or other penalties[.]" RCW 59.30.030(3)(d).

the MHTLA by failing to provide her with a written rental agreement and improperly raising her rent.  After investigating, the Program notified the Park that it had violated the MHLTA.  The Park disputed that it was a mobile home park subject to the MHTLA.

The matter proceeded to a hearing before the Office of Administrative Hearings (OAH).  The OAH determined that the MHLTA did not apply to the Park because the Park contained only one "park model" and, therefore, was not a mobile home park.  The Program and Allen appealed the OAH decision to the superior court.  The superior court concluded that the MHLTA applied to the Park because it was a mobile home park containing two or more "park models," and reversed the OAH decision.  The Park appeals the superior court's order reversing the OAH decision.

We hold that the OAH erred in (1) construing the definition of "park model," (2) concluding that the Park contained only one "park model," (3) concluding that the Park is not a mobile home park, and (4) concluding that the Park is not subject to the MHLTA.  We also hold that the superior court erred in awarding attorney fees to Allen.[2]  Accordingly, we reverse the OAH order and the superior court order on attorney fees, and remand to the OAH for further proceedings consistent with this opinion.

FACTS

A.     THE PARK AND ALLEN

Dan Haugsness owns the Park, which is located in Puyallup, Washington.  At the time of Allen's complaint, the Park rented space to people with different types of trailers and motorhomes.

---

[2] We decline to address the Park's argument regarding the Program's standing to appeal because the claims that the Program raises are also raised by Allen.  We also decline to address the Park's argument that this case is moot because the Park fails to provide legal authority or support for this argument.  RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

No one rented a specific lot or space, but the residents occupied allotted spaces for years. The Park did not provide residents with a rental agreement. Instead, they were provided with a copy of the Park rules.

In January 2014, Allen was given a trailer located in the Park and began living in the trailer. Haugsness told Allen that the trailer was permanent and that she could build onto the trailer. Allen did not receive a written rental agreement when she moved in. Allen asked for a written rental agreement multiple times, but the Park never gave her one.

Allen received a set of the Park rules. The rules discussed the payment of rent and set out certain restrictions within the Park. The rules stated, in part, "Sites shall be free and clear of debris at all times; trailers and RV's shall be maintained in good repair." Administrative Record (AR) at 19. The rules also stated, "Due to the small size of each a[l]lotted space at [the Park], everyone needs to respect each other[']s privacy and property." AR at 19.

In April 2014, Haugsness orally told Allen that her rent would increase by $20 beginning the following month. Allen asked Haugsness where her notice was and he told her that he was giving her notice then. Haugsness returned later that same day and provided Allen with written notice of the increase to start the next month. Allen began paying the increased rent the next month.

B.      COMPLAINT AND INVESTIGATION

In May 2014, Allen filed a request for dispute resolution with the Program, asserting that the Park failed to provide her with a written rental agreement and improperly raised her rent. The Program conducted an investigation and found that the Park violated the MHLTA by failing to

provide Allen a written rental agreement and improperly raising her rent. The Program issued a notice of violation to the Park later that year. The Park appealed the notice of violation.

In February 2015, the Park gave Allen written notice that her rent would increase by an additional $10 beginning in April. The Program later issued a cease and desist order against the Park to stop increasing Allen's rent in violation of the MHLTA. The Park appealed the cease and desist order.

C.      ADMINISTRATIVE HEARING

The OAH consolidated the two appeals and held a hearing. At the hearing, testimony was presented by Allen, Haugsness, and other residents of the Park.

Allen testified about her trailer and the events that led to her complaint. Allen testified that she had lived in her trailer in the Park since January 2014 and that she intended to live in the Park permanently. Her trailer had two bedrooms, no holding tank, and was hooked up to the Park's septic system. The septic was hooked up with a hard pipe, not a flex hose. The trailer did not have a generator and had to be plugged in to have electricity. Allen's trailer had wheels and a tow bar, but it did not have a license plate or tabs. The trailer sat on cinder blocks and did not have jacks.

Barbara Hamrick testified that she had lived in the Park since 2003. Hamrick had talked to Haugsness about how long she would be living in the Park and she told him that she would probably die there. Hamrick had signed a rental agreement to rent month to month. Hamrick lived in an RV trailer with wheels and a trailer attachment. Her trailer was licensed for the road. Hamrick moved her trailer at least twice a year because of flooding. It took about two hours for Hamrick to move. When Hamrick moved her trailer, she had to unplug the electric plug-in, unhook the cable television and sewer, and take the blocks and jacks down.

Matthew Niquette testified that he had lived in the Park on and off for five years. Niquette had no plans to move out of the Park. Niquette lived in a travel trailer. His trailer plugged into the Park's electricity, but it was not hard wired. The trailer's septic was connected with a flex hose. Niquette only moved his trailer if there was flooding. It took about 40 minutes to prepare to move his travel trailer. To move, Niquette had to hitch his travel trailer to his truck, drop the jacks, and unplug the power and the septic. Niquette had a deck that was not attached to his trailer. The tabs on his trailer were expired, but he could get a three-day permit to move the trailer on the road.

Edward Shinkle, II, testified that he had moved back into the Park in 2010 and had lived there for about five years. Shinkle did not have plans to leave the Park. Since his return in 2010, he had not moved his trailer even when there were threats of flooding. Shinkle had changed out the trailer that he lived in three days before he testified, but he had no plans to move his trailer. If Shinkle had to move, he could be on the road in an hour or two. If Shinkle were to leave, he would have to clear the area around the trailer, wheels, and anything underneath. He would then need to unplug the power, sewer, and water. Shinkle had built a rock wall and planted flowers around his trailer. Shinkle also had a small deck that was not attached to his trailer. Shinkle had a license plate on his trailer, but his tabs were not current.

Roy Bordenik testified that he had lived in the Park for nine years. Bordenik lived in a motorhome and had no plans to move out of the Park. Bordenik's motorhome had a self-contained generator and a holding tank for water. Bordenik maintained the grass around his motorhome. Bordenik had a small deck that was not attached. Bordenik left the Park several times a year for a

couple of days. To leave, Bordenik had to unplug his power cord, undo his sewer and water hoses, and then drive away. This process took about 15 to 20 minutes.

Michael Dewey testified that he lived in a motorhome in the Park. It would take about 15 minutes to move his motorhome. Dewey had a little fence around his motorhome, but it was removable. The fence slipped into cement blocks on the ground.

Haugsness testified that he has owned the Park property since 1966. The Park is located in a flood plain. No one rented a specific space or lot of the Park and people move around. The individual trailers in the Park were assigned numbers for identification and mailing purposes. The Park has the same hookups for electricity, water, and sewage as a state park.

D.    ADMINISTRATIVE DECISION

The OAH determined that because the Park contained only one "park model," it was not a mobile home park as defined by the MHLTA and, therefore, was not subject to the MHLTA. The OAH noted that a " 'park model' is 'a recreational vehicle intended for permanent or semi-permanent installation *and* is used as a primary residence.' " AR at 868. The OAH also noted that a " 'recreational vehicle' . . . 'is not occupied as a primary residence, *and* is not immobilized or permanently affixed to a mobile home lot.' " AR at 868 (emphasis in original). In construing the definitions of "park model" and "recreational vehicle," the OAH stated that "immobilized" and "permanently affixed" in the definition of "recreational vehicle" described "semi-permanent" and "permanent installation," respectively. AR at 868-69.

Applying this construction of "park model," the OAH concluded that Allen's trailer was a "park model," noting it sat on cinder blocks, was immobile in its present state, and thus, was semi-permanently installed. AR at 869. The OAH also concluded that the other units in the Park were

6

not "park models" because they were not permanently or semi-permanently installed. AR at 869.

The OAH, therefore, concluded that because the Park was not a mobile home park subject to the

MHLTA, the Park did not violate the MHLTA.

Allen and the Program appealed to the superior court.

E.     SUPERIOR COURT HEARING

On appeal, the superior court concluded that the Park contained two or more park models

and, therefore, was a mobile home park subject to the MHLTA. The superior court reversed the

OAH decision and remanded to the OAH for further proceedings.

The superior court further concluded that Allen was a prevailing party and entitled to

attorney fees under RCW 59.20.110.[3] The superior court ordered that the Park pay attorney fees

in the amount of $41,655.25 to Allen.

The Park appeals.

ANALYSIS

A.     THE WASHINGTON ADMINISTRATIVE PROCEDURES ACT

The Washington Administrative Procedures Act (APA) governs our review in this case.

RCW 59.30.040(10). A reviewing court may reverse an administrative order if the order involves

an error in interpreting or applying the law, the order is not supported by substantial evidence, or

the order is arbitrary or capricious. RCW 34.05.570(3)(d), (e), (i). " 'We sit in the same position

as the superior court and apply the APA to the administrative record.' " *Narrows Real Estate, Inc.*

---

[3] RCW 59.20.110 provides, "In any action arising out of [chapter 59.20 RCW], the prevailing party shall be entitled to reasonable attorney's fees and costs."

*v. Mfd./Mobile Home Dispute Resolution Program*, 199 Wn. App. 842, 852, 401 P.3d 346 (2017) (quoting *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344 P.3d 199 (2015)).

B.       STATUTORY CONSTRUCTION OF "PARK MODEL"

Allen argues that the OAH erred in construing the definition of "park model" under the MHLTA. We agree.

1.       Legal Principles

We review issues of statutory construction de novo. *Clark County Pub. Util. Dist. No. 1 v. Dep't of Revenue*, 153 Wn. App. 737, 747, 222 P.3d 1232 (2009). In interpreting a statute, our fundamental obligation is to give effect to the legislature's intent. *Id*. When the statute's meaning is plain on its face, we give effect to the plain meaning of the statute as an expression of legislative intent. *Id*. When possible, we do not interpret statutes in a manner that renders any portion of the statute superfluous or meaningless. *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996).

We presume that the legislature enacts laws with knowledge of existing laws. *Maziar v. Dep't of Corr.*, 183 Wn.2d 84, 88, 349 P.3d 826 (2015). "Where two statutes are in apparent conflict, we reconcile them, if possible, so that each may be given effect." *City of Lakewood v. Pierce County*, 106 Wn. App. 63, 71, 23 P.3d (2001). "Statutes must be read together to achieve a 'harmonious total statutory scheme . . . which maintains the integrity of the respective statutes.' " *Id*. (quoting *State v. O'Neill*, 103 Wn.2d 853, 862, 700 P.2d 711 (1985)). "When resolving a conflict between two statutes, we must look at the statutory context as a whole to give effect to the intent underlying the legislation." *Servais v. Port of Bellingham*, 72 Wn. App. 183, 192, 864 P.2d 4 (1993), *aff'd*, 127 Wn.2d 820 (1995).

2.      Applicable Provisions in the MHLTA

The MHLTA was enacted to

> regulate and determine legal rights, remedies, and obligations arising from any rental agreement between a landlord and a tenant regarding a mobile home lot and including specified amenities within the mobile home park, mobile home park cooperative, or mobile home park subdivision, where the tenant has no ownership interest in the property or in the association which owns the property, whose uses are referred to as a part of the rent structure paid by the tenant. All such rental agreements shall be unenforceable to the extent any conflict with any provision of [the MHLTA].

RCW 59.20.040.

Under the MHLTA, a "mobile home lot" is defined as

> a portion of a mobile home park or manufactured housing community designated as the location of one mobile home, manufactured home, or park model and its accessory buildings, and intended for the exclusive use as a primary residence by the occupants of that mobile home, manufactured home, or park model[.]

RCW 59.20.030(9).

A "mobile home park" is defined as

> any real property which is rented or held out for rent to others for the placement of two or more mobile homes, manufactured homes, or park models for the primary purpose of production of income, except where such real property is rented or held out for rent for seasonal recreational purpose only and is not intended for year-round occupancy[.]

RCW 59.20.030(10).

In 1993, the legislature added a definition for "recreational vehicle" to the MHLTA. Laws

of 1993 ch. 66, §15. "Recreational vehicle" is defined as

> a travel trailer, motor home, truck camper, or camping trailer that is primarily designed and used as temporary living quarters, is either self-propelled or mounted on or drawn by another vehicle, is transient, is not occupied as a primary residence, and is not immobilized or permanently affixed to a mobile home lot[.]

RCW 59.20.030(17).

In 1999, the legislature added a definition for "park model." Laws of 1999, ch. 359, §2. "Park model" was defined as "a recreational vehicle intended for permanent or semi-permanent installation and habitation." Laws of 1999, ch. 359, §2. The legislature amended this definition in 2003, replacing the phrase "and habitation" with "and is used as a primary residence." Hence, the applicable definition of "park model" is "a recreational vehicle intended for permanent or semi-permanent installation and is used as a primary residence." Laws of 2003, ch. 127, §1; RCW 59.20.030(14).

       3.       Statutory Interpretation of "Park Model"

       a.       Harmonizing "Recreational Vehicle" and "Park Model"

Here, the definition of "recreational vehicle" conflicts with the usage of the term in the definition of "park model." Specifically, a park model is defined as a "recreational vehicle" used as a primary residence, but a "recreational vehicle" is specifically defined as a unit that is *not* occupied as a primary residence.

But when interpreting a statute,

> we are obliged to construe the enactment as a whole, and to give effect to *all* language used. Every provision must be viewed in relation to other provisions and harmonized if at all possible. Preference is given a more specific statute *only* if the two statutes deal with the same subject matter and conflict to such an extent that they cannot be harmonized.

*Omega Nat'l Ins. Co. v. Marquardt*, 115 Wn.2d 416, 425, 799 P. 2d 235 (1990) (footnotes omitted).

When the legislature added to the MHLTA a definition of "park model" by using the term "recreational vehicle" in its definition, the MHLTA already included a separate definition of

"recreational vehicle." Specifically, at the time the legislature added the definition for "park model," "recreational vehicle" was defined as a type of vehicle "used as temporary living quarters . . . is transient, is not occupied as a primary residence, and is not immobilized or permanently affixed to a mobile home lot[.]" RCW 59.20.030(17). Despite this definition, the legislature has defined "park model" as "a recreational vehicle intended for permanent or semi-permanent installation and is used as a primary residence[.]" RCW 59.20.030(14). These two definitions conflict: the definition of "recreational vehicle" describes a type of vehicle that is temporarily used as living quarters, while the recreational vehicle used in the definition of "park model" describes using the recreational vehicle in a permanent or semi-permanent situation as a primary residence. However, this conflict can be harmonized.

The legislature is presumed to know how it defined a "recreational vehicle" at the time it added a definition of "park model" to the MHLTA. *See Maziar*, 183 Wn.2d at 88. Also, a comparison of the enactment dates of the definitional statutes and reading each statute in relation to the others may provide a reasonable basis upon which legislative intent can be determined. *In re Estate of Kerr*, 134 Wn.2d 328, 337, 949 P.2d 810 (1998). In harmonizing the two definitions, the statutes can be read together as a "recreational vehicle" being a type of vehicle that is temporarily used as living quarters, but when the recreational vehicle is intended for permanent or semi-permanent installation and is used as a primary residence, it is considered a "park model."

The Park acknowledges that the MHLTA specifies that there is a difference between recreational vehicles defined in RCW 59.20.030(17) and recreational vehicles occupied as primary residences, citing RCW 59.20.080(3). RCW 59.20.080(3) provides,

11

Chapters 59.12 and 59.18 RCW govern the eviction of recreational vehicles, as defined in RCW 59.20.030, from mobile home parks. This chapter governs the eviction of mobile homes, manufactured homes, park models, and recreational vehicles used as a primary residence from a mobile home park.

The plain language of RCW 59.20.080(3) shows the legislature recognized the potential different uses of a "recreational vehicle" in the MHLTA. For example, the statute specifically recognizes the existence of recreational vehicles used as primary residences in mobile home parks, which is a use different from a "recreational vehicle" used as temporary living quarters as defined in RCW 59.20.030(17). As a result, chapters 59.12 and 59.18 RCW govern the eviction of recreational vehicles as defined by RCW 59.20.030(17), and chapter 59.20 RCW governs the eviction of recreational vehicles that constitute a "park model" and recreational vehicles that do not constitute "park models" but are used as a primary residence.[4]

b.      The Park's arguments

The Park argues that we have already defined "park model" in *Brotherton v. Jefferson County*, 160 Wn. App. 699, 249 P.3d 666 (2011). In *Brotherton*, the court stated in a footnote,

Park model RVs are manufactured dwellings designed to be towed to sites such as mobile home parks to serve as full or part-time residences. Unlike other RVs, they lack self-contained holding tanks and require a sewer connection or external method of waste disposal.

160 Wn. App. at 701 n.1. However, the *Brotherton* court did not define "park model" in the context of RCW 59.20.030. Because the *Brotherton* court did not rely on the definition of "park

---

[4] Allen also argues that the OAH failed to sufficiently consider the legislative hearing records supporting the plain and ordinary meaning of "park model" understood among the various MHLTA stakeholders. However, the hearing records only evidence the stakeholder's understanding and application of the MHLTA, not the actual intent of the legislature.

model" in the context of RCW 59.20.030 in its analysis or holding, the Park's reliance on *Brotherton* is misplaced. Therefore, the Park's argument is unpersuasive.

The Park also argues that (1) the legislature has recognized that "park models" require permits for installation under RCW 36.01.220 and RCW 35.21.897; and (2) "park models" may become real property for taxation purposes under RCW 82.50.530, but travel trailers and recreational vehicles cannot become real property. However, requiring permits for installation of "park models" does not conflict with the definition of "park model" as construed in Section B.3. Moreover, travel trailers and recreational vehicles can become real property for taxation purposes "by virtue of its being permanently sited in location and placed on a foundation of either posts or blocks with connections with sewer, water, or other utilities" and is on property that is owned by the owner of the trailer. RCW 82.50.530. Therefore, the Park's argument fails.

C.      CONCLUSIONS OF LAW

Allen argues that the OAH erred when it concluded that the Park contained only one "park model," the Park was not a mobile home park under the MHLTA, and the Park was not subject to the MHLTA.[5] We agree.

---

[5] Allen assigns error to a number of the OAH's findings of fact, including that (1) no one rents a specific lot in the Park; (2) the Park requires all residents to be ready to move any time; (3) none of the units have anything permanently attached to them, by order of the landlord and in compliance with county code; (4) none of the units are hardwired for electricity or plumbed for septic and water; and (5) Mr. Bordenik's mobile home is not permanently installed at the Park and he has no intention of permanently installing it. However, Allen fails to provide legal argument or support for these assignments of error. Therefore, we do not consider these claims of error. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809. As a result, the OAH's findings are verities on appeal. *Galvis v. Dep't of Transp.*, 140 Wn. App. 693, 709, 167 P.3d 584 (2007) *review denied*, 163 Wn.2d 1041 (2008).

We review an agency's conclusions of law de novo, including whether the findings of fact support the conclusions of law. *Galvis v. Dep't of Transp.*, 140 Wn. App. 693, 708, 167 P.3d 584 (2007) *review denied*, 163 Wn.2d 1041 (2008); *Hickethier v. Dep't of Licensing*, 159 Wn. App. 203, 210, 244 P.3d 1010 (2011). For "mixed questions of law and fact, we determine the law independently and then apply the law to the facts as found by the agency." *Galvis*, 140 Wn. App. at 709. We treat unchallenged findings of fact as verities on appeal. *Id*. "Statements of fact included within conclusions of law will be treated as findings of fact." *Kunkel v. Meridian Oil, Inc.*, 114 Wn.2d 896, 903, 792 P.2d 1254 (1990). To give undefined terms meaning, we may look to dictionary definitions. *LaCoursiere v. CamWest Dev., Inc.*, 181 Wn.2d 734, 741-42, 339 P.3d 963 (2014).

     1.     Number of "Park Models"

Allen argues that the OAH erred by improperly importing the phrases from the definition of "recreational vehicle" into the definition of "park model" to define "semi-permanent installation" to mean "immobilized" and "permanent installation" to mean "permanently affixed." AR at 868-69. Allen also argues that the OAH further erred by concluding that the Park only contained one "park model."[6] We agree.

Under the MHLTA, "park model" is defined as "a recreational vehicle intended for permanent or semi-permanent installation and is used as a primary residence." RCW 59.20.030(14). Neither the terms "permanent," "semi-permanent," nor "installation" are defined

---

[6] Allen also argues that the OAH's conclusion was arbitrary and capricious. However, Allen fails to provide any argument, legal authority, or support for this claim beyond stating that such a conclusion provides grounds for relief. Therefore, we decline to address this claim. RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

in the statute. Because the terms are not defined in the statute, we look to their dictionary definitions. *See LaCoursiere*, 181 Wn.2d at 741-42.

The dictionary defines "permanent" as "continuing or enduring (as in the same state, status, place) without fundamental or marked change . . . fixed or intended to be fixed." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1683 (1969). "Semi-permanent" is defined as "permanent in some respects," "partly permanent," "lasting for an indefinite time," and "virtually permanent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2064 (1969). "Installation" means "setting up or placing in position for service or use." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1171 (1969). Therefore, a "park model" is (1) a recreational vehicle fixed or intended to be fixed in position for use or lasting for an indefinite time in position for use and (2) is used as a primary residence.

a.      Allen's trailer is a "park model"

Here, the Park concedes that Allen's trailer is a "park model." The OAH's unchallenged findings of fact show that because Allen intended to live in her trailer in the Park permanently; had lived in the trailer continuously for several years; had not moved her trailer; and had immobilized her trailer, Allen's trailer is intended to be fixed in position for use, continuously, without fundamental or marked change. As a result, Allen's trailer is intended for permanent installation.

The findings of fact also show that Allen's trailer is her primary residence. Allen had lived in the trailer since January 2014, and she intended to live there permanently. This shows that Allen used her trailer as a primary residence. Therefore, we accept the Park's concession that Allen's trailer is a "park model" under the MHLTA.

15

b.      Shinkle's trailer is a "park model"

Here, the OAH erred by concluding that Shinkle's trailer did not constitute a "park model."[7]   First, the OAH's findings of fact show that Shinkle's trailer is a recreational vehicle under the MHLTA.  The OAH found that Shinkle's unit was a travel trailer and that Shinkle's trailer had a license plate and that he can move the trailer.  These findings support the conclusion that Shinkle's trailer is primarily designed as a temporary living quarters and can be drawn by another vehicle.  Thus, Shinkle's trailer is a recreational vehicle.

Second, the OAH's findings of fact show that Shinkle's trailer was intended for semi-permanent installation.  The OAH found that Shinkle had lived in his trailer in the Park for about five years; had no plans to leave the Park; had never relocated, not even when the Park was threatened with flooding; had built a rock wall and planted flowers around his trailer; and has a small deck that is not attached to his trailer.  These findings show that Shinkle's trailer was intended to be fixed in position for use for an indefinite time, permanent in some respects, and partly permanent.  As a result, Shinkle's trailer was intended for semi-permanent installation.

Third, the OAH found that Shinkle had lived in the Park for about five years and that he had no plans to leave the park.  These findings showed that Shinkle uses his trailer as a primary residence.  Therefore, contrary to the OAH's conclusion, Shinkle's trailer is also a "park model" under the MHLTA.

---

[7] The Park asserts that all of the Park resident witnesses, except Allen, testified that they do not live in "park models."  To the contrary, Niquette testified that he lived in a "park model."  AR at 1034.  Other witnesses testified that they were not familiar with the definition of "park model" under RCW 59.20.030(14).

Because Allen's trailer is a "park model" and the OAH erred in concluding that Shinkle's trailer did not constitute a "park model" under the MHLTA, the OAH also erred in concluding that there was only one "park model."

2.      Mobile Home Park

Allen also argues that the OAH erred when it concluded that the Park was not a mobile home park.[8]  We agree.

Under the MHLTA, "mobile home park" is defined as

any real property which is rented or held out for rent to others for the placement of two or more mobile homes, manufactured homes, or park models for the primary purpose of production of income, except where such real property is rented or held out for rent for seasonal recreational purpose only and is not intended for year-round occupancy.

RCW 59.20.030(10).  As discussed above, a "park model" is "a recreational vehicle intended for permanent or semi-permanent installation and is used as a primary residence."  *See supra* Section B.3; RCW 59.20.030(14).

Here, the OAH erred by concluding that the Park was not a mobile home park.  The Park is real property and the Park is held out for rent to others.  As discussed above, the Park is held out for rent for the placement of two or more park models.  *See supra* Section C.1.  Also, it is undisputed that the Park is held out for rent to others for the primary purpose of producing income.  And the Park is not held out to rent for seasonal recreational purposes only and is intended for

---

[8] The Park argues that the OAH's ruling is consistent with prior Pierce County district court decisions and Pierce County code enforcement.  However, the Park does not provide legal authority or support to show that these prior decisions are controlling here.  Therefore, we decline to address this claim.  RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809.

year-round occupancy. Allen, Hamrick, Niquette, Shinkle, and Bordenik have each lived in the Park continuously for several years. As a result, the OAH's findings show that the Park is

> real property which is rented or held out for rent to others for the placement of two or more mobile homes, manufactured homes, or park models for the primary purpose of production of income, except where such real property is rented or held out for rent for seasonal recreational purpose only and is not intended for year-round occupancy.

RCW 59.20.030(10). Given these findings, we hold that the OAH erred in concluding that the Park is not a mobile home park.

### 3. Applicability of MHLTA

Allen next argues that the OAH erred when it concluded that the Park was not subject to the MHLTA. We agree.

The MHLTA

> shall regulate and determine legal rights, remedies, and obligations arising from any rental agreement between a landlord and a tenant regarding a mobile home lot and including specified amenities within the mobile home park, mobile home park cooperative, or mobile home park subdivision, where the tenant has no ownership interest in the property or in the association which owns the property, whose uses are referred to as a part of the rent structure paid by the tenant.

RCW 59.20.040. From the plain language of RCW 59.20.040, the MHLTA applies when there is a rental agreement between a mobile home park landlord and a mobile home lot tenant where the tenant has no ownership interest in the property and the property's uses are referred to as a part of the rent structure paid by the tenant. The MHTLA requirements are met here.

18

a.      Rental agreement

First, there is a rental agreement.  Here, Allen lived in the Park and provided rent to the Park.  This agreement and Allen's use of the Park was based on the rules the Park gave to Allen.  Thus, there is a rental agreement.

b.      Mobile home park landlord

Second, Haugsness is a mobile home park landlord.  " 'Landlord' means the owner of a mobile home park and includes the agents of a landlord[.]"  RCW 59.20.030(4).  Here, there is no dispute Haugsness owns the property at issue.  And the Park is a mobile home park as discussed above.  *See supra* Section C.2.  Thus, there is a mobile home park landlord.

c.      Mobile home park tenant

Third, Allen is a mobile home lot tenant.  A "tenant" is "any person, except a transient [as defined in RCW 59.20.030(19)], who rents a mobile home lot[.]"  RCW 59.20.030(18).  A "mobile home lot" is

> a portion of a mobile home park or manufactured housing community designated as the location of one mobile home, manufactured home, or park model and its accessory buildings, and intended for the exclusive use as a primary residence by the occupants of that mobile home, manufactured home, or park model.

RCW 59.20.030(9).

Here, Allen rented a mobile home lot.  Although no one rented a specific lot or space in the Park, residents rented a portion of the Park designated as the location of one park model, which is intended for the exclusive use as a primary residence.  The Park rules referenced different sites and allotted spaces within the Park.  The Park rules discussed keeping sites clear of debris and limited the number of vehicles per space.  The Park rules also state that "[d]ue to the small size of

each a[l]lotted space at [the Park], everyone needs to respect each other[']s privacy and property." AR at 19. Allen had lived in her trailer since January 2014 and had not moved her trailer. She had been informed by the Park that her trailer was permanent. Thus, Allen rented a mobile home lot, and because she rented a mobile home lot, Allen is also a mobile home lot tenant.

d.      No ownership interest in the property

Fourth, Allen does not have an ownership interest in the property. Here, Haugsness owns the Park and Allen provided rent to the Park according to the Park rules. Thus, Allen did not have an ownership interest in the property.

e.      Uses referenced as a part of rent structure

Fifth, the uses of the property are referred to as a part of the rent structure paid by Allen. Here, the Park provided Allen with a set of Park rules. The rules set out restrictions on each site within the Park and covered the structure by which Allen paid rent. Thus, the uses of the property were referred to as a part of the rent structure paid.

Thus, we hold that the Park is subject to the MHTLA. Because OAH concluded that the Park did not violate the MHLTA based on the erroneous conclusion that the MHLTA did not apply to the Park, we remand to the OAH for determination of whether the Park violated the MHLTA.

D.      ATTORNEY FEES BELOW

The Park argues that the superior court erred when it awarded Allen attorney fees. We agree that the superior court erred in awarding fees to Allen.

We review whether there is a legal basis for an award of attorney fees de novo. *Pub. Util. Dist. No. 2 of Pac. Cty. v. Comcast of Wash. IV, Inc.*, 184 Wn. App. 24, 82, 336 P.3d 65 (2014), *review denied*, 183 Wn.2d 1015 (2015). Under RCW 59.30.040(9), "If an administrative hearing

is initiated, the respondent and complainant shall each bear the cost of his or her own legal expenses." The MHLTA also states, "In any action arising out of [chapter 59.20 RCW], the prevailing party shall be entitled to reasonable attorney's fees and costs." RCW 59.20.110.

Here, the superior court erred in awarding Allen attorney fees. The superior court awarded Allen attorney fees as the prevailing party under RCW 59.20.110. Under that statute, "In any action arising out of [chapter 59.20 RCW], the prevailing party shall be entitled to reasonable attorney's fees and costs." RCW 59.20.110. However, this action did not arise out of chapter 59.20 RCW. Instead, this action arose out of chapter 59.30 RCW. As a result, Allen was not entitled to attorney fees under RCW 59.20.110.

Allen argues that the action "clearly arose out of the Park's violations of the MHLTA and Ms. Allen's subsequent complaints to the [Program]." Reply Br. of Allen at 22. However, although the reason for Allen's request for dispute resolution may have come from a potential violation of chapter 59.20 RCW, this particular action arose out of and was initiated under chapter 59.30 RCW, the dispute resolution statute.

RCW 59.30.040(13) states,

This section is not exclusive and does not limit the right of landlords or tenants to take legal action against another party as provided in chapter 59.20 RCW or otherwise. Exhaustion of the administrative remedy provided in this chapter is not required before a landlord or tenants may bring a legal action.

This statute shows that the remedy provided by chapter 59.30 RCW is distinct from that provided by chapter 59.20 RCW, and supports the conclusion that the attorney fees and costs provided under RCW 59.20.110 is limited to those incurred as a result of a legal action arising from chapter 59.20 RCW. Therefore, we hold that the superior court erred in awarding attorney fees to Allen.

E.      ATTORNEY FEES ON APPEAL

Allen and the Park both request attorney fees on appeal. We decline to award attorney fees to either party on appeal.

First, the Park requests attorney fees and costs on appeal under RCW 4.84.350(1). Under that statute, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees." RCW 4.84.350(1). However, because the Park does not prevail against Allen, the Park is not entitled to attorney fees.

Second, Allen requests attorney fees and costs on appeal under RCW 59.20.110.[9] RCW 59.20.110 provides, "In any action arising out of [chapter 59.20 RCW], the prevailing party shall be entitled to reasonable attorney's fees and costs." However, as discussed above, this action did not arise out of chapter 59.20 RCW. Allen initiated this action under chapter 59.30 RCW by filing a request with the Program. As a result, Allen is not entitled to attorney fees under RCW 59.20.110. Therefore, we decline to award attorney fees on appeal to either party.

---

[9] Allen alternatively requests attorney fees and costs under RCW 4.84.350(1). Under that statute, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees . . . ." RCW 4.84.350(1). A "qualified party" is "(a) an individual whose net worth did not exceed one million dollars at the time the initial petition for judicial review was filed or (b) a sole owner of an unincorporated business, or a partnership, corporation, association, or organization whose net worth did not exceed five million dollars at the time the initial petition for judicial review was filed . . . ." RCW 4.84.340(5). Allen fails to show that she is a qualified party. Therefore, we decline to award attorney fees on appeal to Allen under RCW 4.84.350(1).

CONCLUSION

In conclusion, we hold that the OAH erred in (1) construing the definition of "park model," (2) concluding that the Park contained only one "park model," (3) concluding that the Park is not a mobile home park, and (4) concluding that the Park is not subject to the MHLTA. We also hold that the superior court erred in awarding attorney fees to Allen. Accordingly, we reverse the OAH order and the superior court order on attorney fees, and remand to the OAH for further proceedings consistent with this opinion.

_____
Lee, J.

We concur:

_____
Maxa, C.J.

_____
Melnick, J.

23